## LLOYD CORP., LTD. *v.* TANNER ET AL.

No. 71–492.   Argued April 18, 1972—Decided June 22, 1972

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which DOUGLAS, BRENNAN, and STEWART, JJ., joined, *post*, p. 570.

*George Black, Jr.,* argued the cause for petitioner. With him on the briefs were *Robert J. Miller, John H. Pickering,* and *Timothy B. Dyk.*

*Carl R. Neil* argued the cause for respondents. With him on the brief were *Melvin L. Wulf* and *Sanford Jay Rosen.*

Briefs of *amici curiae* urging reversal were filed by *Jerry Kronenberg, Gerard C. Smetana,* and *Alan Raywid* for the American Retail Federation, and by *Lawrence M. Cohen* and *Allen B. Gresham* for the Homart Development Co.

*Roger Jon Diamond* filed a brief for People's Lobby, Inc., as *amicus curiae* urging affirmance.

MR. JUSTICE POWELL delivered the opinion of the Court.

This case presents the question reserved by the Court in *Amalgamated Food Employees Union* v. *Logan Valley Plaza,* 391 U. S. 308 (1968), as to the right of a privately owned shopping center to prohibit the distribution of handbills on its property when the handbilling is unrelated to the shopping center's operations. Relying primarily on *Marsh* v. *Alabama,* 326 U. S. 501 (1946), and *Logan Valley,* the United States District Court for the District of Oregon sustained an asserted First Amendment right to distribute handbills in petitioner's shopping center, and issued a permanent injunction restraining petitioner from interfering with such right. 308 F. Supp. 128 (1970). The Court of Appeals for the Ninth Circuit affirmed, 446 F. 2d 545 (1971). We granted certiorari to consider petitioner's contention that the decision below

violates rights of private property protected by the Fifth and Fourteenth Amendments. 404 U. S. 1037 (1972).

Lloyd Corp., Ltd. (Lloyd), owns a large, modern retail shopping center in Portland, Oregon. Lloyd Center embraces altogether about 50 acres, including some 20 acres of open and covered parking facilities which accommodate more than 1,000 automobiles. It has a perimeter of almost one and one-half miles, bounded by four public streets. It is crossed in varying degrees by several other public streets, all of which have adjacent public sidewalks. Lloyd owns all land and buildings within the Center, except these public streets and sidewalks. There are some 60 commercial tenants, including small shops and several major department stores.

The Center embodies a relatively new concept in shopping center design. The stores are all located within a single large, multi-level building complex sometimes referred to as the "Mall." Within this complex, in addition to the stores, there are parking facilities, malls, private sidewalks, stairways, escalators, gardens, an auditorium, and a skating rink. Some of the stores open directly on the outside public sidewalks, but most open on the interior privately owned malls. Some stores open on both. There are no public streets or public sidewalks within the building complex, which is enclosed and entirely covered except for the landscaped portions of some of the interior malls.

The distribution of the handbills occurred in the malls. They are a distinctive feature of the Center, serving both utilitarian and esthetic functions. Essentially, they are private, interior promenades with 10-foot sidewalks serving the stores, and with a center strip 30 feet wide in which flowers and shrubs are planted, and statuary, fountains, benches, and other amenities are located. There is no vehicular traffic on the malls. An archi-

tectural expert described the purpose of the malls as follows:

> "In order to make shopping easy and pleasant, and to help realize the goal of maximum sales [for the Center], the shops are grouped about special pedestrian ways or malls. Here the shopper is isolated from the noise, fumes, confusion and distraction which he normally finds along city streets, and a controlled, carefree environment is provided . . . ."[1]

Although the stores close at customary hours, the malls are not physically closed, as pedestrian window shopping is encouraged within reasonable hours.[2] Lloyd employs 12 security guards, who are commissioned as such by the city of Portland. The guards have police authority within the Center, wear uniforms similar to those worn by city police, and are licensed to carry handguns. They are employed by and subject to the control of Lloyd. Their duties are the customary ones, including shoplifting surveillance and general security.

At a few places within the Center, small signs are embedded in the sidewalk which state:

> "NOTICE—Areas In Lloyd Center Used By The

---

[1] App. 254.

[2] The manager of the Center testified:

"Q. Turning now to the general policy in operation of the Lloyd Center, it's true that the malls and walkways within the center are open 24 hours a day; is that right?·

"A. Well, they aren't physically closed such as putting a gate across, no. But, they are not—when people are there after hours, they are watched. And, if it is too late at night, they are told the places are closed and they should leave.

"Q. If I wanted to walk through the center malls of Lloyd Center at 3:00 in the morning, would anyone stop me?

"A. Depending on who the officer was on duty as to what he is supposed to do. But, they would have made inquiry and followed you to see what you are doing." App. 49.

Public Are Not Public. Ways But Are For The Use Of Lloyd Center Tenants And The Public Transacting Business With Them. Permission To Use Said Areas May Be Revoked At Any Time. Lloyd Corporation, Ltd."

The Center is open generally to the public, with a considerable effort being made to attract shoppers and prospective shoppers, and to create "customer motivation" as well as customer goodwill in the community. In this respect the Center pursues policies comparable to those of major stores and shopping centers across the country, although the Center affords superior facilities for these purposes. Groups and organizations are permitted, by invitation and advance arrangement, to use the auditorium and other facilities. Rent is charged for use of the auditorium except with respect to certain civic and charitable organizations, such as the Cancer Society and Boy and Girl Scouts. The Center also allows limited use of the malls by the American Legion to sell poppies for disabled veterans, and by the Salvation Army and Volunteers of America to solicit Christmas contributions. It has denied similar use to other civic and charitable organizations. Political use is also forbidden, except that presidential candidates of both parties have been allowed to speak in the auditorium.[3]

The Center had been in operation for some eight years when this litigation commenced. Throughout this period it had a policy, strictly enforced, against the distribution of handbills within the building complex and its malls. No exceptions were made with respect to handbilling, which was considered likely to annoy customers, to create litter, potentially to create disorders,

---

[3] The manager of the Center, explaining why presidential candidates were allowed to speak, said: "We do that for one reason and that is great public interest. It . . . brings a great many people to Lloyd Center who may shop before they leave." App. 51.

and generally to be incompatible with the purpose of the Center and the atmosphere sought to be preserved.

On November 14, 1968, the respondents in this case distributed within the Center handbill invitations to a meeting of the "Resistance Community" to protest the draft and the Vietnam war. The distribution, made in several different places on the mall walkways by five young people, was quiet and orderly, and there was no littering. There was a complaint from one customer. Security guards informed the respondents that they were trespassing and would be arrested unless they stopped distributing the handbills within the Center.[4] The guards suggested that respondents distribute their literature on the public streets and sidewalks adjacent to but outside of the Center complex. Respondents left the premises as requested "to avoid arrest" and continued the handbilling outside. Subsequently this suit was instituted in the District Court, seeking declaratory and injunctive relief.

I

The District Court, emphasizing that the Center "is open to the general public," found that it is "the functional equivalent of a public business district." 308 F. Supp., at 130. That court then held that Lloyd's "rule prohibiting the distribution of handbills within the Mall violates . . . First Amendment rights." 308 F. Supp., at 131. In a *per curiam* opinion, the Court of Appeals held that it was bound by the "factual determination" as to the character of the Center, and concluded that the decisions of this Court in *Marsh* v. *Alabama*, 326 U. S. 501 (1946), and *Amalgamated Food*

---

[4] The city of Portland has an ordinance which makes it unlawful to trespass on private property. Portland, Ore., Police Code § 16–613.

*Employees Union* v. *Logan Valley Plaza,* 391 U. S. 308 (1968), compelled affirmance.[5]

*Marsh* involved Chickasaw, Alabama, a company town wholly owned by the Gulf Shipbuilding Corp. The opinion of the Court, by Mr. Justice Black, described Chickasaw as follows:

> "Except for [ownership by a private corporation] it has all the characteristics of any other American town. The property consists of residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places are situated. A deputy of the Mobile County Sheriff, paid by the company, serves as the town's policeman. Merchants and service establishments have rented the stores and business places on the business block and the United States uses one of the places as a post office from which six carriers deliver mail to the people of Chickasaw and the adjacent area. The town and the surrounding neighborhood, which can not be distinguished from the Gulf property by anyone not familiar with the property lines, are thickly settled, and according to all indications the residents use the business block as their regular shopping center. To do so, they now, as they have for many years, make use of a company-owned paved street and sidewalk located alongside the store fronts in order to enter and leave the stores and the post office. Intersecting company-owned roads at each end of the business block lead into a four-lane public highway which runs parallel to the business block at a distance of thirty feet. There is nothing to stop

---

[5] The Court of Appeals also relied on *Wolin* v. *Port of New York Authority,* 392 F. 2d 83 (CA2 1968).

highway traffic from coming onto the business block and upon arrival a traveler may make free use of the facilities available there. In short the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation." 326 U. S., at 502–503.

A Jehovah's Witness undertook to distribute religious literature on a sidewalk near the post office and was arrested on a trespassing charge. In holding that First and Fourteenth Amendment rights were infringed, the Court emphasized that the business district was within a company-owned town, an anachronism long prevalent in some southern States and now rarely found.[6]

In *Logan Valley* the Court extended the rationale of *Marsh* to peaceful picketing of a store located in a large shopping center, known as Logan Valley Mall, near Altoona, Pennsylvania. Weis Markets, Inc. (Weis), an original tenant, had opened a supermarket in one of the larger stores and was employing a wholly nonunion staff. Within 10 days after Weis opened, members of Amalgamated Food Employees Union Local 590 (Union) began picketing Weis, carrying signs stating that it was a nonunion market and that its employees were not receiving union wages or other union benefits. The picketing, conducted by nonemployees, was carried out

---

[6] In commenting on the necessity for citizens who reside in company towns to have access to information, the Court said: "Many people in the United States live in company-owned towns. These people, just as residents of municipalities, are free citizens of their State and country. Just as all other citizens they must make decisions which affect the welfare of community and nation. To act as good citizens they must be informed." 326 U. S., at 508.

almost entirely in the parcel pickup area immediately adjacent to the store and on portions of the adjoining parking lot. The picketing was peaceful, with the number of pickets varying from four to 13.

Weis and Logan Valley Plaza, Inc., sought and obtained an injunction against this picketing. The injunction required that all picketing be confined to public areas outside the shopping center. On appeal the Pennsylvania Supreme Court affirmed the issuance of the injunction, and this Court granted certiorari. In framing the question, this Court stated:

> "The case squarely presents . . . the question whether Pennsylvania's generally valid rules against trespass to private property can be applied in these circumstances to bar petitioners from the Weis and Logan premises." 391 U. S., at 315.

The Court noted that the answer would be clear "if the shopping center premises were not privately owned but instead constituted the business area of a municipality." *Ibid.* In the latter situation, it has often been held that publicly owned streets, sidewalks, and parks are so historically associated with the exercise of First Amendment rights that access to them for purposes of exercising such rights cannot be denied absolutely. *Lovell* v. *Griffin,* 303 U. S. 444 (1938); *Hague* v. *CIO,* 307 U. S. 496 (1939); *Schneider* v. *State,* 308 U. S. 147 (1939); *Jamison* v. *Texas,* 318 U. S. 413 (1943).

The Court then considered *Marsh* v. *Alabama, supra,* and concluded that:

> "The shopping center here is clearly the functional equivalent of the business district of Chickasaw involved in *Marsh."* 391 U. S., at 318.

But the Court was careful not to go further and say that for all purposes and uses the privately owned streets,

sidewalks, and other areas of a shopping center are analogous to publicly owned facilities:

> "All we decide here is that because the shopping center serves as the community business block 'and is freely accessible and open to the people in the area and those passing through,' *Marsh* v. *Alabama,* 326 U. S., at 508, the State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises in a manner and for a purpose generally consonant with the use to which the property is actually put." *Id.,* at 319–320.

The Court noted that the scope of its holding was limited, and expressly reserved judgment on the type of issue presented in this case:

> "The picketing carried on by petitioners was directed specifically at patrons of the Weis Market located within the shopping center and the message sought to be conveyed to the public concerned the manner in which that particular market was being operated. We are, therefore, not called upon to consider whether respondents' property rights could, consistently with the First Amendment, justify a bar on picketing which was not thus directly related in its purpose to the use to which the shopping center property was being put." *Id.,* at 320 n. 9.

The Court also took specific note of the facts that the Union's picketing was "directed solely at one establishment within the shopping center," *id.,* at 321, and that the public berms and sidewalks were "from 350 to 500 feet away from the Weis store." *Id.,* at 322. This distance made it difficult "to communicate [with] patrons of Weis" and "to limit [the] effect [of

the picketing] to Weis only." *Id.*, at 322, 323.[7]  *Logan Valley* was decided on the basis of this factual situation, and the facts in this case are significantly different.

## II

The courts below considered the critical inquiry to be whether Lloyd Center was "the functional equivalent of a public business district."[8]  This phrase was first used in *Logan Valley*, but its genesis was in *Marsh.* It is well to consider what *Marsh* actually decided. As noted above, it involved an economic anomaly of the past, "the company town." One must have seen such towns to understand that "functionally" they were no different from municipalities of comparable size. They developed primarily in the Deep South to meet economic conditions, especially those which existed following the Civil War. Impoverished States, and especially backward areas thereof, needed an influx of industry and capital. Corporations attracted to the area by natural resources and abundant labor were willing to assume the role of local government. Quite literally, towns

---

[7] The Court also commented on the increasing role of shopping centers and on the problem which they would present with respect to union activities if picketing were totally proscribed within shopping center areas: "Business enterprises located in downtown areas [on public streets and sidewalks] would be subject to on-the-spot public criticism for their [labor] practices, but businesses situated in the suburbs could largely immunize themselves from similar criticism by creating a *cordon sanitaire* of parking lots around their stores." 391 U. S., at 324–325. The concurring opinion of MR. JUSTICE DOUGLAS also emphasized the related purpose of the picketing in *Logan Valley:* "Picketing in regard to labor conditions at the Weis Supermarket is directly related to that shopping center business." 391 U. S., at 326.

[8] 308 F. Supp. 128, 130, 132 (Ore. 1970); 446 F. 2d 545, 546 (CA9 1971).

were built and operated by private capital with all of the customary services and utilities normally afforded by a municipal or state government: there were streets, sidewalks, sewers, public lighting, police and fire protection, business and residential areas, churches, postal facilities, and sometimes schools. In short, as Mr. Justice Black said, Chickasaw, Alabama, had "all the characteristics of any other American town." 326 U. S., at 502. The Court simply held that where private interests were substituting for and performing the customary functions of government, First Amendment freedoms could not be denied where exercised in the customary manner on the town's sidewalks and streets. Indeed, as title to the entire town was held privately, there were no publicly owned streets, sidewalks, or parks where such rights could be exercised.

*Logan Valley* extended *Marsh* to a shopping center situation in a different context from the company town setting, but it did so only in a context where the First Amendment activity was related to the shopping center's operations. There is some language in *Logan Valley*, unnecessary to the decision, suggesting that the key focus of *Marsh* was upon the "business district," and that whenever a privately owned business district serves the public generally its sidewalks and streets become the functional equivalents of similar public facilities.[9] As Mr. Justice Black's dissent in *Logan Valley* emphasized, this would be an incorrect interpretation of the Court's decision in *Marsh:* [10]

> "*Marsh* was never intended to apply to this kind of situation. *Marsh* dealt with the very special

---

[9] *Amalgamated Food Employees Union* v. *Logan Valley Plaza,* 391 U. S. 308, 319 (1968).

[10] As Mr. Justice Black was the author of the Court's opinion in *Marsh,* his analysis of its rationale is especially meaningful.

situation of a company-owned town, complete with streets, alleys, sewers, stores, residences, and everything else that goes to make a town. The particular company town involved was Chickasaw, Alabama, which, as we stated in the opinion, except for the fact that it 'is owned by the Gulf Shipbuilding Corporation . . . has all the characteristics of any other American town. The property consists of residential buildings, streets, a system of sewers, a sewage disposal plant and a "business block" on which business places are situated.' 326 U. S., at 502. Again toward the end of the opinion we emphasized that 'the town of Chickasaw does not function differently from any other town.' 326 U. S., at 508. I think it is fair to say that the basis on which the *Marsh* decision rested was that the property involved encompassed an area that for all practical purposes had been turned into a town; the area had all the attributes of a town and was exactly like any other town in Alabama." 391 U. S., at 330–331.

The holding in *Logan Valley* was not dependent upon the suggestion that the privately owned streets and sidewalks of a business district or a shopping center are the equivalent, for First Amendment purposes, of municipally owned streets and sidewalks. No such expansive reading of the opinion of the Court is necessary or appropriate. The opinion was carefully phrased to limit its holding to the picketing involved, where the picketing was "directly related in its purpose to the use to which the shopping center property was being put," 391 U. S., at 320 n. 9, and where the store was located in the center of a large private enclave with the consequence that no other reasonable opportunities for the pickets to convey their message to their intended audience were available.

Neither of these elements is present in the case now before the Court.

### A

The handbilling by respondents in the malls of Lloyd Center had no relation to any purpose for which the center was built and being used.[11] It is nevertheless argued by respondents that, since the Center is open to the public, the private owner cannot enforce a restriction against handbilling on the premises. The thrust of this argument is considerably broader than the rationale of *Logan Valley*. It requires no relationship, direct or indirect, between the purpose of the expressive activity and the business of the shopping center. The message sought to be conveyed by respondents was directed to all members of the public, not solely to patrons of Lloyd Center or of any of its operations. Respondents could have distributed these handbills on any public street, on any public sidewalk, in any public park, or in any public building in the city of Portland.

Respondents' argument, even if otherwise meritorious, misapprehends the scope of the invitation extended to the public. The invitation is to come to the Center to do business with the tenants. It is true that facilities at the Center are used for certain meetings and

---

[11] The injunction issued against Lloyd is comprehensive. It enjoins Lloyd (and others in active concert or participation with it) from "preventing or interfering with the distribution of non-commercial handbills in a peaceful and orderly manner in the malls and walkways within Lloyd Center at times when they are open to general public access." There is no limitation as to type of literature distributed except that it must be "non-commercial." Nor, indeed, is there any limitation in this injunction as to the number of persons participating in such activities or the frequency thereof. Irrespective of how controversial, offensive, distracting, or extensive the distributions may be, Lloyd has been ordered to allow all noncommercial handbilling which anyone desires to undertake within its private premises.

for various promotional activities. The obvious purpose, recognized widely as legitimate and responsible business activity, is to bring potential shoppers to the Center, to create a favorable impression, and to generate goodwill. There is no open-ended invitation to the public to use the Center for any and all purposes, however incompatible with the interests of both the stores and the shoppers whom they serve.

MR. JUSTICE WHITE, dissenting in *Logan Valley*, noted the limited scope of a shopping center's invitation to the public:

> "In no sense are any parts of the shopping center dedicated to the public for general purposes . . . . The public is invited to the premises but only in order to do business with those who maintain establishments there. The invitation is to shop for the products which are sold. There is no general invitation to use the parking lot, the pickup zone, or the sidewalk except as an adjunct to shopping. No one is invited to use the parking lot as a place to park his car while he goes elsewhere to work. The driveways and lanes for auto traffic are not offered for use as general thoroughfares leading from one public street to another. Those driveways and parking spaces are not public streets and thus available for parades, public meetings, or other activities for which public streets are used." 391 U. S., at 338.

It is noteworthy that respondents' argument based on the Center's being "open to the public" would apply in varying degrees to most retail stores and service establishments across the country. They are all open to the public in the sense that customers and potential customers are invited and encouraged to enter. In terms of being open to the public, there are differences only

of degree—not of principle—between a free-standing store and one located in a shopping center, between a small store and a large one, between a single store with some malls and open areas designed to attract customers and Lloyd Center with its elaborate malls and interior landscaping.

## B

A further fact, distinguishing the present case from *Logan Valley,* is that the Union pickets in that case would have been deprived of all reasonable opportunity to convey their message to patrons of the Weis store had they been denied access to the shopping center.[12] The situation at Lloyd Center was notably different. The central building complex was surrounded by public sidewalks, totaling 66 linear blocks. All persons who enter or leave the private areas within the complex must cross public streets and sidewalks, either on foot or in automobiles. When moving to and from the privately

---

[12] The Court's opinion in *Logan Valley* described the obstacles resulting from the location of the Weis store in the shopping center, and its relation to public streets and sidewalks: "Petitioners' picketing was directed solely at one establishment within the shopping center. The berms surrounding the center are from 350 to 500 feet away from the Weis store. All entry onto the mall premises by customers of Weis, so far as appears, is by vehicle from the roads alongside which the berms run. Thus the placards bearing the message which petitioners seek to communicate to patrons of Weis must be read by those to whom they are directed either at a distance so great as to render them virtually indecipherable—where the Weis customers are already within the mall—or while the prospective reader is moving by car from the roads onto the mall parking areas via the entrance ways cut through the berms. In addition, the pickets are placed in some danger by being forced to walk along heavily traveled roads along which traffic moves constantly at rates of speed varying from moderate to high. Likewise, the task of distributing handbills to persons in moving automobiles is vastly greater (and more hazardous) than it would be were petitioners permitted to pass them out within the mall to pedestrians." 391 U. S., at 321–322.

owned parking lots, automobiles are required by law to come to a complete stop. Handbills may be distributed conveniently to pedestrians, and also to occupants of automobiles, from these public sidewalks and streets. Indeed, respondents moved to these public areas and continued distribution of their handbills after being requested to leave the interior malls. It would be an unwarranted infringement of property rights to require them to yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist. Such an accommodation would diminish property rights without significantly enhancing the asserted right of free speech. In ordering this accommodation the courts below erred in their interpretation of this Court's decisions in *Marsh* and *Logan Valley*.

### III

The basic issue in this case is whether respondents, in the exercise of asserted First Amendment rights, may distribute handbills on Lloyd's private property contrary to its wishes and contrary to a policy enforced against *all* handbilling. In addressing this issue, it must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on *state* action, not on action by the owner of private property used nondiscriminatorily for private purposes only. The Due Process Clauses of the Fifth and Fourteenth Amendments are also relevant to this case. They provide that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." There is the further proscription in the Fifth Amendment against the taking of "private property . . . for public use, without just compensation."

Although accommodations between the values protected by these three Amendments are sometimes nec-

essary, and the courts properly have shown a special solicitude for the guarantees of the First Amendment, this Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only. Even where public property is involved, the Court has recognized that it is not necessarily available for speaking, picketing, or other communicative activities. Mr. Justice Black, speaking for the Court in *Adderley* v. *Florida,* 385 U. S. 39 (1966), said:

> "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. For this reason there is no merit to the petitioners' argument that they had a constitutional right to stay on the property, over the jail custodian's objections, because this 'area chosen for the peaceful civil rights demonstration was not only "reasonable" but also particularly appropriate . . . .' Such an argument has as its major unarticulated premise the assumption that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please. That concept of constitutional law was vigorously and forthrightly rejected in two of the cases petitioners rely on, *Cox* v. *Louisiana,* [379 U. S.], at 554–555 and 563–564. We reject it again. The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose." 385 U. S., at 47–48.

Respondents contend, however, that the property of a large shopping center is "open to the public," serves the same purposes as a "business district" of a municipality, and therefore has been dedicated to certain types

of public use. The argument is that such a center has sidewalks, streets, and parking areas which are functionally similar to facilities customarily provided by municipalities. It is then asserted that all members of the public, whether invited as customers or not, have the same right of free speech as they would have on the similar public facilities in the streets of a city or town.

The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use. The closest decision in theory, *Marsh* v. *Alabama, supra,* involved the assumption by a private enterprise of all of the attributes of a state-created municipality and the exercise by that enterprise of semi-official municipal functions as a delegate of the State.[13] In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State. In the instant case there is no comparable assumption or exercise of municipal functions or power.

Nor does property lose its private character merely because the public is generally invited to use it for designated purposes. Few would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there. Nor is size alone the controlling factor. The essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center. This is not to say that no differences may exist with respect to government regula-

---

[13] Mr. Justice Black, dissenting in *Logan Valley,* emphasized the distinction between a privately owned shopping center and the "company town" involved in *Marsh,* which he said had assumed "*all* the attributes" of a municipality. 391 U. S., at 332. (Original emphasis.)

tion or rights of citizens arising by virtue of the size and diversity of activities carried on within a privately owned facility serving the public. There will be, for example, problems with respect to public health and safety which vary in degree and in the appropriate government response, depending upon the size and character of a shopping center, an office building, a sports arena, or other large facility serving the public for commercial purposes. We do say that the Fifth and Fourteenth Amendment rights of private property owners, as well as the First Amendment rights of all citizens, must be respected and protected. The Framers of the Constitution certainly did not think these fundamental rights of a free society are incompatible with each other. There may be situations where accommodations between them, and the drawing of lines to assure due protection of both, are not easy. But on the facts presented in this case, the answer is clear.

We hold that there has been no such dedication of Lloyd's privately owned and operated shopping center to public use as to entitle respondents to exercise therein the asserted First Amendment rights. Accordingly, we reverse the judgment and remand the case to the Court of Appeals with directions to vacate the injunction.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE STEWART join, dissenting.

Donald Tanner, Betsy Wheeler, and Susan Roberts (respondents) brought this action for a declaratory judgment that they have the right under the First and Fourteenth Amendments to the United States Constitution to distribute handbills in a shopping center owned by petitioner and an injunction to enforce that right.

Relying primarily on our very recent decision in *Amalgamated Food Employees Union* v. *Logan Valley Plaza,* 391 U. S. 308 (1968), the United States District Court for the District of Oregon granted the relief requested. 308 F. Supp. 128 (1970). The United States Court of Appeals for the Ninth Circuit affirmed. 446 F. 2d 545 (1971). Today, this Court reverses the judgment of the Court of Appeals and attempts to distinguish this case from *Logan Valley.* In my view, the distinction that the Court sees between the cases does not exist. As I read the opinion of the Court, it is an attack not only on the rationale of *Logan Valley,* but also on this Court's longstanding decision in *Marsh* v. *Alabama,* 326 U. S. 501 (1946). Accordingly, I dissent.

## I

Lloyd Center is a large, modern retail shopping center in Portland, Oregon. Sprawling over 50 acres of land, the Center offers to shoppers more than 60 commercial businesses and professional offices. It also affords more than 850,000 square feet of open and covered offstreet parking space—enough to accommodate more than 1,000 vehicles. Bounded by four public streets, Lloyd Center has a perimeter of almost one and one-half miles. Fou public streets running east-west and one running north-south traverse the Center, and at least six other public streets run partly into or around it. All of these streets have adjacent sidewalks. These streets and sidewalks are the only parts of the Center that are not privately owned.

The principal portion of the Center is occupied by a shopping area called the "Mall." Covering approximately 25 acres of land and having a perimeter of four-fifths of a mile, the Mall, in the words of the District Court, "is a multi-level complex of buildings, parking facilities, sub-malls, sidewalks, stairways, elevators, es-

calators, bridges, and gardens, and contains a skating rink, statues, murals, benches, directories, information booths, and other facilities designed to attract. visitors and make them comfortable." 308 F. Supp., at 129. No public streets cross the Mall, but some stores face those streets that form the perimeter, and it is possible to enter those stores from public sidewalks. Other stores are located in the interior of the Mall, and can only be reached by using privately owned walkways.

On November 14, 1968, respondents entered the Mall and distributed handbills inviting the public to a meeting to protest the draft and the Vietnam war. The distribution was peaceful, nondisruptive, and litter-free. Security guards employed by the Center approached respondents, indicated that the Center did not permit handbilling in the Mall, suggested that they distribute their materials on the public sidewalks and streets, and informed them that they could be arrested if they persisted in handbilling within the privately owned portions of the Center. These guards wore uniforms that were virtually identical to those worn by regular Portland police and they possessed full police authority. Believing that they would be arrested if they did not leave the Mall, respondents departed and subsequently filed this lawsuit.[1]

A. The question presented by this case is whether one of the incidents of petitioner's private ownership of the Lloyd Center is the power to exclude certain

---

[1] There is some conflict in the testimony as to precisely what the guards told respondents with respect to the likelihood that they would be arrested if they did not leave the Mall. The Agreed Facts in the Pretrial Order states that the guards said that respondents *could* be arrested if they refused to leave. The District Court found that the guards caused respondents to believe that they would be arrested and that this was the reason that they left the Mall. The Court of Appeals affirmed this finding and it is supported by the record.

forms of speech from its property. In other words, we must decide whether ownership of the Center gives petitioner unfettered discretion to determine whether or not it will be used as a public forum.

This Court held in *Marsh* v. *Alabama, supra,* that even though property is privately owned, under some circumstances it may be treated as though it were publicly held, at least for purposes of the First Amendment. In *Marsh,* a member of the Jehovah's Witnesses religious sect was arrested and convicted of violating Alabama's criminal trespass statute when she undertook to distribute religious literature in the downtown shopping area of a privately owned town without permission of the owner. The Court reasoned that "[t]he more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Id.,* at 506. Noting that the stifling effect produced by any ban on free expression in a community's central business district was the same whether the ban was imposed by public or private owners, the Court concluded that:

> "When we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion, as we must here, we remain mindful of the fact that the latter occupy a preferred position. As we have stated before, the right to exercise the liberties safeguarded by the First Amendment 'lies at the foundation of free government by free men' and we must in all cases 'weigh the circumstances and . . . appraise the . . . reasons . . . in support of the regulation . . . of the rights.' . . . In our view the circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, were held by others than the public, is not suffi-

cient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a state statute." (Footnotes and citations omitted.) *Id.*, at 509.

We relied heavily on *Marsh* in deciding *Logan Valley, supra.* In *Logan Valley,* a shopping center in its formative stages contained a supermarket and department store. The supermarket employed a staff composed of only nonunion employees. Members of Amalgamated Food Employees Union, Local 590, began to picket the market with signs stating that the market's employees were not receiving union wages or union benefits. The picketing was carried out almost entirely in the parcel pickup area and that portion of the parking lot immediately adjacent thereto. 391 U. S., at 311. The supermarket sought and obtained an injunction from a Pennsylvania state court prohibiting the union members from trespassing upon the parking areas or in the store, the effect of which was to prohibit picketing and handbilling on any part of the private property and to relegate the union members to carrying signs on the publicly owned earthen berms that surrounded the shopping center.[2] Finding that the shopping center was the functional equivalent of the business district involved in *Marsh,* we could see "no reason why access to a business district in a company town for the purpose of exercising First Amendment rights should be constitutionally re-

---

[2] *Logan Valley* involved both picketing and handbilling, since the effect of the state court injunction was to ban both forms of expression. 391 U. S., at 322–323 and n. 12. We made it clear in *Logan Valley* that while there were obvious differences between picketing and handbilling, both involved a modicum of a burden on property. We held that neither could be barred from a shopping center that was the functional equivalent of a public business district. *Id.*, at 315–316.

quired, while access for the same purpose to property functioning as a business district should be limited simply because the property surrounding the 'business district' is not under the same ownership." *Id.*, at 319. Thus, we held that the union activity was constitutionally protected.

B. In the instant case the District Court found that "the Mall is the functional equivalent of a public business district" within the meaning of *Marsh* and *Logan Valley*. The Court of Appeals specifically affirmed this finding, and it is overwhelmingly supported by the record.

The Lloyd Center is similar to Logan Valley Plaza in several respects: both are bordered by public roads, and the entrances of both lead directly into the public roads; both contain large parking areas and privately owned walkways leading from store to store; and the general public has unrestricted access to both. The principal differences between the two centers are that the Lloyd Center is larger than Logan Valley, that Lloyd Center contains more commercial facilities, that Lloyd Center contains a range of professional and nonprofessional services that were not found in Logan Valley, and that Lloyd Center is much more intertwined with public streets than Logan Valley. Also, as in *Marsh, supra,* Lloyd's private police are given full police power by the city of Portland, even though they are hired, fired, controlled, and paid by the owners of the Center. This was not true in *Logan Valley.*

In 1954, when Lloyd's owners first acquired land for the Center, the city of Portland vacated about eight acres of public streets for their use. The ordinance accomplishing the vacation sets forth the city's view of the Center's function:

> "WHEREAS the Council finds that the reason for these vacations is for general building purposes to

be used in the development of a *general retail business district* and the development of an adequate parking area to support said district; . . . the Council . . . finds that in order to develop a large retail unit such as contemplated by Lloyd Corporation, Ltd., it is necessary to vacate the streets above mentioned . . . ." (Emphasis added.) Ordinance No. 101288, Nov. 10, 1954, App. 202.

The 1954 ordinance also indicates that the city of Portland was aware that as Lloyd Center developed, it would be necessary for the city to build new streets and to take other steps to control the traffic flow that the Center would engender. App. 202, 208–209. In 1958, an emergency ordinance was passed giving the Lloyd Center an extension of time to meet various conditions on which the 1954 vacations were made. The city council viewed the projected Center as offering an "opportunity for much needed employment" and concluded that the emergency ordinance was "necessary for the immediate preservation of the public health, peace and safety of the city of Portland." Ordinance No. 107641, March 20, 1958, App. 196.

In sum, the Lloyd Center is an integral part of the Portland community. From its inception, the city viewed it as a "business district" of the city and depended on it to supply much-needed employment opportunities. To insure the success of the Center, the city carefully integrated it into the pattern of streets already established and planned future development of streets around the Center. It is plain, therefore, that Lloyd Center is the equivalent of a public "business district" within the meaning of *Marsh* and *Logan Valley*. In fact, the Lloyd Center is much more analogous to the company town in *Marsh* than was the Logan Valley Plaza.

Petitioner agrees with our decision in *Logan Valley* that it is proper for courts to treat shopping centers

differently from other privately owned property, like
private residences. The Brief for Petitioner states at
pages 9–10 that

> "[a] shopping center, which falls somewhere be-
> tween the extremes of a company town and a pri-
> vate residence, is neither absolutely subject to the
> control of the owner nor is it absolutely open to
> all those wishing to engage in speech activities. . . .
>
> . . . . .
>
> "Each case requires an appropriate resolution of
> the conflicting interests of shopping center owners
> and those seeking to engage in speech activities on
> shopping center premises."

Petitioner contends that our decision in *Logan Valley*
struck the appropriate balance between First Amend-
ment and private property interests. The argument is
made, however, that this case should be distinguished
from *Logan Valley,* and this is the argument that the
Court accepts.

## II

As I have pointed out above, Lloyd Center is even
more clearly the equivalent of a public business district
than was Logan Valley Plaza. The First Amendment
activity in both *Logan Valley* and the instant case was
peaceful and nondisruptive; and both cases involve tra-
ditionally acceptable modes of speech. Why then should
there be a different result here? The Court's answer is
that the speech in this case was directed at topics of
general interest—the Vietnam war and the draft—
whereas the speech in Logan Valley was directed to
the activities of a store in the shopping center, and that
this factual difference is of constitutional dimensions.
I cannot agree.

A. It is true that in *Logan Valley* we explicitly left
open the question whether "property rights could, con-

sistently with the First Amendment, justify a bar on picketing [or handbilling] which was not . . . directly related in its purpose to the use to which the shopping center property was being put." 391 U. S., at 320 n. 9. But, I believe that the Court errs in concluding that this issue must be faced in the instant case.

The District Court observed that Lloyd Center invites schools to hold football rallies, presidential candidates to give speeches, and service organizations to hold Veterans Day ceremonies on its premises. The court also observed that the Center permits the Salvation Army, the Volunteers of America, and the American Legion to solicit funds in the Mall. Thus, the court concluded that the Center was already open to First Amendment activities, and that respondents could not constitutionally be excluded from distributing leaflets solely because Lloyd Center was not enamored of the form or substance of their speech. The Court of Appeals affirmed, taking the position that it was not extending either *Logan Valley* or *Marsh*. In other words, the District Court found that Lloyd Center had deliberately chosen to open its private property to a broad range of expression and that having done so it could not constitutionally exclude respondents, and the Court of Appeals affirmed this finding.

Petitioner apparently concedes that if the lower courts are correct, respondents should prevail. Brief for Petitioner 19. This concession is, in fact, mandated by our decision in *Logan Valley,* in which we specifically held that members of the public may exercise their First Amendment rights on the premises of a shopping center that is the functional equivalent of a business district if their activity is "generally consonant with the use to which the property is actually put." 391 U. S., at 320. If the property of Lloyd Center is generally open to First Amendment activity, respondents cannot be excluded.

On Veterans Day, Lloyd Center allows organizations to parade through the Center with flags, drummers, and color guard units and to have a speaker deliver an address on the meaning of Veterans Day and the valor of American soldiers. Presidential candidates have been permitted to speak without restriction on the issues of the day, which presumably include war and peace. The American Legion is annually given permission to sell poppies in the Mall because Lloyd Center believes that "veterans . . . deserves [sic] some comfort and support by the people of the United States." [3] In light of these facts, I perceive no basis for depriving respondents of the opportunity to distribute leaflets inviting patrons of the Center to attend a meeting in which different points of view would be expressed from those held by the organizations and persons privileged to use Lloyd Center as a forum for parading their ideas and symbols.

I believe that the lower courts correctly held that respondents' activities were directly related in purpose to the use to which the shopping center was being put. In my view, therefore, this case presents no occasion to consider whether or not *Logan Valley* should be extended. But, the Court takes a different view and concludes that Lloyd Center was never opened to First Amendment activity. Even if I could agree with the Court on this point, I would not reach a different result in this case.

B. If respondents had distributed handbills complaining about one or more stores in Lloyd Center or about

---

[3] App. 62 (testimony of R. Horn, manager of Lloyd Center). It is widely known that the American Legion is a Veteran's organization. See 1 Encyclopedia of Associations 997 (7th ed. 1972). It is also common knowledge that the poppy is the symbol sold by the Legion to finance various of its activities. At times the proceeds from selling poppies were used to finance lobbying and other activities directed at increasing the military capacity of the United States. R. Jones, A History of the American Legion 330–332 (1946).

the Center itself, petitioner concedes that our decision in *Logan Valley* would insulate that conduct from proscription by the Center.[4]   I cannot see any logical reason to treat differently speech that is related to subjects other than the Center and its member stores.

We must remember that it is a balance that we are striking—a balance between the freedom to speak, a freedom that is given a preferred place in our hierarchy of values, and the freedom of a private property owner to control his property.   When the competing interests are fairly weighed, the balance can only be struck in favor of speech.

Members of the Portland community are able to see doctors, dentists, lawyers, bankers, travel agents, and persons offering countless other services in Lloyd Center. They can buy almost anything that they want or need there.   For many Portland citizens, Lloyd Center will so completely satisfy their wants that they will have no reason to go elsewhere for goods or services.   If speech is to reach these people, it must reach them in Lloyd Center.   The Center itself recognizes this.   For example, in 1964 its director of public relations offered candidates for President and Vice President the use of the center for political speeches, boasting "that our convenient location and setting would provide the largest audience [the candidates] could attract in Oregon." App. 187.

For many persons who do not have easy access to television, radio, the major newspapers, and the other forms of mass media, the only way they can express themselves to a broad range of citizens on issues of general public concern is to picket, or to handbill, or to utilize other

---

[4] The record indicates that when unions have picketed inside the Mall, Lloyd Center has voiced no objections. App. 108 (testimony of R. Horn, manager of Lloyd Center).   It is apparent that petitioner has no difficulty in accepting our decision in *Logan Valley* and in complying with it.

free or relatively inexpensive means of communication. The only hope that these people have to be able to communicate effectively is to be permitted to speak in those areas in which most of their fellow citizens can be found. One such area is the business district of a city or town or its functional equivalent.[5] And this is why respondents have a tremendous need to express themselves within Lloyd Center.

Petitioner's interests, on the other hand, pale in comparison. For example, petitioner urges that respondents' First Amendment activity would disturb the Center's customers. It is undisputed that some patrons will be disturbed by any First Amendment activity that goes on, regardless of its object. But, there is no evidence to

---

[5] It is evident from the Court's opinion that the majority fails to grasp the essence of our decision in *Logan Valley*. The Court notes that there is a difference between a free-standing store and one located in a shopping center, and between small stores and extremely large ones, but suggests that because the difference is "of degree—not of principle" it is unimportant. This flies directly in the face of *Logan Valley*, where we said that as private property expands to the point where it becomes, in reality, the business district of a community, the rights of the owners to proscribe speech on the part of those invited to use the property diminish. When the Court states that this was broad language that was somehow unnecessary to our decision, it betrays its misunderstanding of the holding.

As Mr. Justice Black and Mr. JUSTICE WHITE both pointed out in dissent in *Logan Valley*, there was really only one issue before the Court—i. e., whether the Logan Valley Plaza was prevented by the Fourteenth Amendment from inhibiting speech even though it was private property. The critical issue was whether the private property had sufficient "public" qualities to warrant a holding that the Fourteenth Amendment reached it. We answered this question in the affirmative, and the answer was the pivotal factor in our decision. Every member of the Court was acutely aware that we were dealing with degrees, not absolutes. But we found that degrees of difference can be of constitutional dimension. While any differences between the instant case and *Logan Valley* are immaterial in my view, such differences as there are make this a clearer case of illegal state action.

indicate that speech directed to topics unrelated to the shopping center would be more likely to impair the motivation of customers to buy than speech directed to the uses to which the Center is put, which petitioner concedes is constitutionally protected under *Logan Valley.* On the contrary, common sense would indicate that speech that is critical of a shopping center or one or more of its stores is more likely to deter consumers from purchasing goods or services than speech on any other subject. Moreover, petitioner acknowledges that respondents have a constitutional right to "leaflet" on any subject on public streets and sidewalks within Lloyd Center. It is difficult for me to understand why leafletting in the Mall would be so much more disturbing to the Center's customers.

I also find patently frivolous petitioner's argument that if handbilling in the Mall is permitted, Lloyd Center would face inordinate difficulties in removing litter from its premises. The District Court found that respondents' activities were litter-free. Assuming, *arguendo,* that if respondents had been permitted to continue their activities, litter might have resulted, I think that it is immediately apparent that even if respondents confined their activites to the public streets and sidewalks of the Center as Lloyd's private police suggested, litter would have been a problem as the recipients of the handbills carried them to the shopping and parking areas. Petitioner concedes that it would have had to remove this litter. There is no evidence that the amount of litter would have substantially increased if respondents distributed the leaflets within the Mall. But, even assuming that the litter might have increased, that is not a sufficient reason for barring First Amendment activity. See, *e. g., Schneider* v. *State,* 308 U. S. 147 (1939). If petitioner is truly concerned about litter, it should accept a previous suggestion by this Court and prosecute those

who throw handbills away, not those who use them for communicative purposes.[6]  *Id.,* at 162.

In sum, the balance plainly must be struck in favor of speech.

C. Petitioner's other grounds for denying respondents access to the Mall can be dealt with quickly.  The assertion is made that petitioner had the right to regulate the manner in which First Amendment activity took place on its property, and that because the public streets and sidewalks inside the Center offered sufficient access to the public, it was permissible to deny respondents use of the Mall.  The District Court found that certain stores in the Center could only be reached by using the private walkways of the Mall.  Those persons who drove into the Center, parked in the privately owned parking lots, and who entered the stores accessible only through the Mall could not be safely reached from the public streets and sidewalks.  Hence, the District Court properly found that the Mall was the only place where respondents had reasonable access to all of Lloyd Center's patrons.[7]  308 F. Supp., at 131.  At one point in this

---

[6] Since petitioner's security guards have full police power, they can enforce state laws against littering, just as they have enforced laws against loitering in the past.  App. 45 (testimony of R. Horn, manager of Lloyd Center).

[7] The Court implies that it is willing to reverse both lower courts and hold that their findings that alternative forums for leafletting in Lloyd Center were either not as effective as the Mall or dangerous are clearly erroneous.  I too have read the record in this case and I find no warrant for such a holding.  The record plainly shows that it was impossible to reach many of the shoppers in the Center without using the Mall unless respondents were willing to approach cars as they were leaving the center.  The District Court and the Court of Appeals took the view that requiring respondents to run from the sidewalk, to knock on car windows, to ask that the windows be rolled down so that a handbill could be distributed, to offer the handbill, run back to the sidewalk, and to repeat this gesture for every automobile leaving Lloyd Center involved hazards not only to

litigation, petitioner also attempted to assert that it was entitled to bar respondents' distribution of leaflets on the ground that the leaflets violated the Selective Service laws. The District Court found that this contention was without merit. 308 F. Supp., at 132–133. It seems that petitioner has abandoned the contention in this Court. In any event, it is meritless for the reasons given by the District Court.

### III

In his dissenting opinion in *Logan Valley*, 391 U. S., at 339, MR. JUSTICE WHITE said that the rationale of that case would require affirmance of a case like the instant one. MR. JUSTICE WHITE, at that time, was convinced that our decision in *Logan Valley*, incorrect though he thought it to be, required that all peaceful and non-disruptive speech be permitted on private property that was the functional equivalent of a public business district.

As stated above, I believe that the earlier view of MR. JUSTICE WHITE is the correct one, that there is no legitimate way of following *Logan Valley* and not applying it to this case. But, one may suspect from reading the opinion of the Court that it is *Logan Valley* itself that the Court finds bothersome. The vote in *Logan Valley* was 6–3, and that decision is only four years old. But, I am aware that the composition of this Court has radically changed in four years. The fact remains that *Logan Valley* is binding unless and until it is overruled. There is no valid distinction between that case and this one, and, therefore, the results in both cases should be the same.

---

respondents but also to other pedestrians and automobile passengers. Having never seen Lloyd Center, except in photographs contained in the record, and having absolutely no idea of the amount of traffic entering or leaving the Center, the Court cavalierly overturns the careful findings of facts below. This, in my opinion, exceeds even the most expansive view of the proper appellate function of this Court.

While the majority is obviously troubled by the rationale of *Logan Valley*, it is interesting that none of the participants in this litigation have experienced any similar difficulty. Lloyd Corp. urges that *Logan Valley* was correctly decided, that it struck a balance that the First Amendment required us to strike, and that it has fully complied with *Logan Valley* with respect to labor activity. The American Retail Federation urges in its Brief as *amicus curiae* that a balance must be struck between the property interests of shopping center owners and the First Amendment interests of shopping center users. It does not urge that *Logan Valley* was incorrectly decided in any way.

It is true that Lloyd Corp. and the American Retail Federation ask the Court to distinguish this case from *Logan Valley*, but what is more important is that they recognize that when massive areas of private property are opened to the public, the First Amendment may come into play. They would like, of course, to limit the impact of speech on their private property, but whether or not they can do so consistently with the First Amendment is a question that this Court must resolve.

We noted in *Logan Valley* that the large-scale movement of this country's population from the cities to the suburbs has been accompanied by the growth of suburban shopping centers. In response to this phenomenon, cities like Portland are providing for large-scale shopping areas within the city. It is obvious that privately owned shopping areas could prove to be greatly advantageous to cities. They are totally self-sufficient, needing no financial support from local government; and if, as here, they truly are the functional equivalent of a public business area, the city reaps the advantages of having such an area without paying for them. Some of the advantages are an increased tax base, a drawing attraction for residents, and a stimulus to further growth.

It would not be surprising in the future to see cities rely more and more on private businesses to perform functions once performed by governmental agencies. The advantage of reduced expenses and an increased tax base cannot be overstated. As governments rely on private enterprise, public property decreases in favor of privately owned property. It becomes harder and harder for citizens to find means to communicate with other citizens. Only the wealthy may find effective communication possible unless we adhere to *Marsh* v. *Alabama* and continue to hold that "[t]he more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it," 326 U. S., at 506.

When there are no effective means of communication, free speech is a mere shibboleth. I believe that the First Amendment requires it to be a reality. Accordingly, I would affirm the decision of the Court of Appeals.