630 F.2d 1012
 105 L.R.R.M. (BNA) 2473, 89 Lab.Cas. P 12,241
 HUTZLER BROTHERS COMPANY, Petitioner,
v.
The NATIONAL LABOR RELATIONS BOARD, Respondent,
Retail Store Employees Union, Local 692, Intervenor,
Chamber of Commerce of the United States of America, Amicus Curiae,
The American Retail Federation, Amicus Curiae.
 No. 79-1252.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 6, 1980.
Decided Sept. 10, 1980.
 
 Leonard E. Cohen, Baltimore, Md. (Jeffrey Rockman, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., on brief), for petitioner.
 Norton J. Come, Deputy Associate Gen. Counsel, Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Christopher W. Katzenbach, N. L. R. B., Washington, D. C., on brief), for respondent.
 Beth Shulman, Washington, D. C., for intervenor.
 Lawrence M. Cohen, Carol R. Brody, Fox & Grove, Chicago, Ill., Stephen A. Bokat, National Chamber Litigation Center, Washington, D. C., on brief, as amicus curiae The Chamber of Commerce of the United States of America.
 Larry E. Forrester, Dan T. Carter, Timothy W. Johnson, Smith, Currie & Hancock, Atlanta, Ga., on brief, as amicus curiae The American Retail Federation.
 Before BUTZNER, HALL and SPROUSE, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 This is a petition by Hutzler Brothers Company to review and set aside an order of the National Labor Relations Board which required Hutzler to permit organizers from Local 692 of the Retail Store Employees' Union to have access to Hutzler's Towson, Maryland, store. The Board found that Hutzler had violated Sections 7 and 8(a)(1) of the Labor Management Relations Act of 1947, 29 U.S.C. §§ 157, 158(a)(1), by denying the union access to store employees. The Board filed a cross-application for enforcement of its order. We reverse, finding that the General Counsel has not sustained his burden of proving that the Union had no other reasonable means of communicating with the employees.
 
 
 2
 Hutzler operates a chain of retail department stores. In the late summer of 1976, the Union received several telephone calls from employees of Hutzler's Towson store requesting contact by the Union to organize the store. The employees did not provide their names nor the names and addresses of other employees. The Union, which was then engaged in organizing campaigns at other Hutzler stores, sent two organizers to survey the Towson store. After their initial survey on two separate days, they appeared on August 30, 1976, together with a third organizer, and attempted for several minutes to distribute handbills soliciting Union membership. The handbills were distributed at two lower level entrances to the store. Security guards requested the organizers to leave. They initially refused, but left the premises within a few minutes after their arrival upon advice of police officers. They did not return nor was there any other effort to contact store employees. The Union later requested company officials to provide it with a list of employees, but that request was refused.
 
 
 3
 Gilbert Feldman, the Union's Director of Organization, admitted that the Union made only a minimal effort to organize the Towson store. Mr. Feldman testified that:
 
 
 4
 A. Well, the reason very little was done, as I said earlier, we were working on at least the five programs I mentioned and I am sure it was more. . . . (W)e were spread throughout the State of Maryland, plus had an active program on another Hutzlers (sic) store. We did not have the manpower or the time to sit in on Towson if there wasn't more of an interest there to keep us there. . . . It just was that with the timetable we had going, so many activities, we didn't have the manpower or the time to do it at that time.
 
 
 5
 Q. Did you have any employees who were sympathetic to the union within the Hutzlers (sic) Towson store?
 
 
 6
 A. Not to my knowledge. I am sure there were some, but we didn't have enough time to seek them out.
 
 
 7
 Hutzler's Towson store is located close to a large shopping mall but is a separate structure with a large contiguous parking lot. The store has four shopping levels, a large public restaurant, and an employee cafeteria. It is surrounded on four sides by public streets but, aside from two emergency doors, there is only one entrance at the street level. The Hutzler-owned parking lot which is used both by customers and employees is at a lower level than the street level. There are two main entrances at this lower level from which the store may be entered directly from the parking lot without crossing a public street. These entrances are the most frequently used by both customers and employees due to their location off the parking lot. There is also an open stairway that connects the public sidewalk from the street level to the two lower level entrances.
 
 
 8
 The employees work in staggered shifts arriving at various times until 10:00 a. m., the opening time for the store. Approximately 32% arrive before 10:00 a. m. on an average day. Normally 25% of the employees leave work between 5:00 p. m. and 6:00 p. m., 20% between 9:00 p. m. and 10:00 p. m., with the others leaving at scattered times. Employees are required to use one of the two entrances/exits at the lower level before 10:00 a. m., at 9:30 p. m., the closing time, or anytime when carrying packages out of the store. At all other times they are allowed to use any entrances/exits.
 
 
 9
 Hutzler employees wear name tags while at work containing their last names and first initials. Approximately 116 of the 550 employees wear uniforms while at work. The Hutzler evidence indicated it was possible to copy the names from name tags while employees were at work inside the store. The Union had no known contacts inside the store and there was no attempt to make home visits, telephone calls, or to write letters to employees. No effort was made to contact employees on the public sidewalks surrounding the store and parking lot. There was no specific evidence concerning the difficulty of contacting Hutzler employees in neighboring businesses, restaurants, or sidewalks. Aside from the few minutes of handbilling on August 30, there was no attempt to contact the employees.
 
 
 10
 There are three vehicle entrances to the Hutzler parking lot, all from four-lane roads which are controlled either by stop lights or stop signs for exiting traffic. All three entrances are divided by median strips at the point where the entrances join the main road. In this parking area Hutzler provides a parking area for its employees with places for 235 cars located adjacent to one of the lower-level entrances. Most employees who drive to work use this parking area.
 
 
 11
 Hutzler's vice-president testified that he would have had no objections to the Union organizers copying automobile license numbers on the store parking lot. Other evidence indicated it is routinely possible to obtain the names and addresses of the owners' licensed automobiles from the Maryland Motor Vehicles Department by payment of one dollar ($1.00) for each inquiry. There was no Union attempt to pass out handbills from the median islands at each of the three entrances to the parking lots. Although there was some evidence concerning the general nature of the parking lots, the medians separating the access roads, and the number of cars entering the lot, there was no testimony concerning the speed of the cars, specific instances concerning the driving patterns of vehicles, nor any testimony concerning the difficulty of passing out handbills from the medians.
 
 
 12
 The Towson store's 550 employees live in communities throughout the Baltimore Metropolitan area. In that area there are three major television stations, two UHF television stations, one non-commercial television station, three major newspapers, numerous small community newspapers, four major AM radio stations, and several FM radio stations. There was no attempt to advertise in community newspapers or other mass media.
 
 
 13
 The Board adopted the Administrative Law Judge's findings. It concluded that the use of mass media and billboards would be overly expensive and ineffective in this large metropolitan area to communicate with 550 employees of one store. It found that with minimal effort the Union could have located the employees' automobiles in the parking lot but that numerous other cars used the lot. It would be inefficient, therefore, for Union organizers to handbill indiscriminately in order to reach the approximately 250 employees using the parking lot. The volume of traffic would also pose a hazard to Union organizers. The Board also determined that since the only entrance off the public sidewalk on the street level was not open until 10:00 o'clock a. m., the Union could not efficiently communicate with the employees by handbilling. It concluded that other means of access were so difficult "that only by access to Respondent's property . . . (could) meaning be given to the Section 7 rights of Respondent's employees."
 
 
 14
 Section 7 of the National Labor Relations Act provides in part:
 
 
 15
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .
 
 
 16
 29 U.S.C. § 157. Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157." 29 U.S.C. § 158(a)(1).
 
 
 17
 It is axiomatic, of course, that freedom of communication is essential to the free exercise of organizational rights. "(O)rganization rights are not viable in a vacuum; their effectiveness depends in some measure on the ability of employees to learn the advantages and disadvantages of organization from others." Central Hardware Co. v. NLRB, 407 U.S. 539, 543, 92 S.Ct. 2238, 2241, 33 L.Ed.2d 122 (1972).
 
 
 18
 While the Act guarantees employees the right to discuss union organization among themselves and with union organizers, non-employees normally have no right to enter upon an employer's property. The employer is entitled to protection in the enjoyment of his private property rights. PruneYard Shopping Center v. Robins, --- U.S. ---, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); Hudgens v. NLRB, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972).
 
 
 19
 Twenty-four years ago in NLRB v. Babcock & Wilcox, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), the Supreme Court recognized both the right of employees to be contacted by union organizers and the right of employers to the enjoyment of private property. It there expressed the proper accommodation between these two often conflicting rights. The Babcock principles continue to govern the rights of union organizers to approach employees on employer private property. The opinion stated:
 
 
 20
 (A)n employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution....
 
 
 21
 This is not a problem of always open or always closed doors for union organization on company property. . . . Accommodation between the two must be obtained with as little destruction of one as is consistent with the maintenance of the other.
 
 
 22
 Id. at 112, 76 S.Ct. at 684.
 
 
 23
 In Central Hardware Co. v. NLRB, 407 U.S. at 543, 92 S.Ct. at 2241, the Supreme Court said:
 
 
 24
 The Board and the courts have the duty to resolve conflicts between organization rights and property rights, and to seek a proper accommodation between the two.
 
 
 25
 The Supreme Court in subsequent decisions has placed on the union the burden of proving inaccessibility and the ineffectiveness of alternate means of communication. In Sears, Roebuck and Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), the Court, deciding a preemption case, said:
 
 
 26
 To gain access, the union has the burden of showing that no other reasonable means of communicating its organizational message to the employees exists or that the employer's access rules discriminate against union solicitation. That the burden imposed on the union is a heavy one is evidenced by the fact that the balance struck by the Board and the courts under the Babcock accommodation principle has rarely been in favor of trespassory organizational activity.
 
 
 27
 Id. at 205, 98 S.Ct. at 1762 (footnotes omitted). See also Central Hardware Co. v. NLRB, 468 F.2d 252, 255 (8th Cir. 1972).
 
 
 28
 The resiliency of Babcock perhaps rests on the nature of the standard it announced. The Supreme Court did not attempt to define inaccessibility nor did it delineate what constitutes effective communication to employees. It left specific determinations to the Board and courts under the announced general principles. See Central Hardware Co. v. NLRB, 468 F.2d 252 (8th Cir. 1972); NLRB v. Tamiment, Inc., 451 F.2d 794 (3rd Cir. 1971), cert. denied, 409 U.S. 1012, 93 S.Ct. 440, 34 L.Ed.2d 306 (1972); Farah Manufacturing Co. v. NLRB, 450 F.2d 942 (5th Cir. 1971); NLRB v. S. & H. Grossinger's, Inc., 372 F.2d 26 (2nd Cir. 1967); Scholle Chemical Corp. v. NLRB, 82 L.R.R.M. 2410 (7th Cir. 1972); The Falk Corp., 192 N.L.R.B. 716 (1971); Monogram Models, Inc., 192 N.L.R.B. 705 (1971); Farah Manufacturing Co., 187 N.L.R.B. 601; Solo Cup Co., 172 NLRB 1110 (1968); General Dynamics Telecommunications, 137 N.L.R.B. 1725 (1962).
 
 
 29
 It is the Board which must initially determine if the union has met its burden and its decision on the facts is entitled to great weight. As the Babcock opinion pointed out:
 
 
 30
 The determination of the proper adjustments rests with the Board. Its rulings, when reached on findings of fact supported by substantial evidence on the record as a whole, should be sustained by the courts unless its conclusions rest on erroneous legal foundations.
 
 
 31
 351 U.S. at 112, 76 S.Ct. at 684 (footnote omitted). See also Hudgens, 424 U.S. at 522, 96 S.Ct. at 1037.
 
 
 32
 The Board here found that required access to store property was necessary because there were no other reasonably available avenues of communication. The issue then is whether there is substantial evidence to sustain the Board's finding.
 
 
 33
 The degree of isolation of employees is, of course, an important evidentiary factor, and in this case, apparent. The employees for the most part enter the store from the two entrances on company property. Only a minimal percentage could be contacted after 10:00 a. m. from a public sidewalk at one street-level entrance. The Hutzler Towson store is adjacent to a large commercial complex of approximately 40 buildings. Once Hutzler employees leave the store at lunch or thereafter, they frequently mingle in the larger complex and their identification is difficult. The parking lot for approximately half the employees is located on Hutzler property and can only be entered with the acquiescence of Hutzler. Acquiescence is also necessary for the identification of employees inside the store by copying from their name tags. The employees live throughout a large metropolitan area and work at staggered times. The fact, therefore, that employees are highly isolated from Union solicitation cannot be denied. Union contact was made more difficult by Hutzler refusing permission to handbill and its refusal to provide lists of the names of employees.
 
 
 34
 The ultimate question, however, is not whether organizational contact of employees is difficult but whether the difficulty can be reasonably overcome. There indeed may be situations where the combination of physical location, type of work, and employer activity make it apparent that reasonable alternative methods of communications do not exist. In such cases it would not be necessary to prove the futility of attempting alternative means of communication by active efforts on the part of union organizers. To prove that access to employer property is required, it is not necessary that every possible means of communications be exhausted. This, of course, again involves the question of drawing the evidentiary line. As employees become more isolated and the task of communicating with them becomes more difficult-less efforts may be required of union organizers to garner evidence that alternate reasonable means of communication are unavailable.
 
 
 35
 The union's organizational effort, or lack of it, however, remains a factual circumstance to be weighed in deciding if the union has met its burden of proof. A union with a highly professional organizational department should at least make a serious attempt to organize a company before it can complain about lack of access to the employer's property. It seems improbable, moreover, that a union could achieve organizational success with lackadaisical efforts such as are in evidence in this case. Absent an effort by the union to communicate by other possibly available means, the Board can only infer inadequate access from physical evidence of structure and location of the plant, the working habits of employees, and the conduct of the employer.
 
 
 36
 The Union's Director of Organizations in this case candidly admitted that the employees physical isolation was not seriously challenged by the Union. The Union was busy with other organizational drives. Whether from lack of personnel, funding, or perceived employee indifference-the efforts at the Towson Hutzler store were pro forma. The Union did not have the time to solicit assistance from inside employees nor the time or resources to attempt other means of communication with the employees. The Union's efforts consisted of distributing handbills for a few minutes on company property and writing a letter requesting a list of employees from Hutzler management.
 
 
 37
 Hutzler officials may have misstated their prospective consent to permitting access by the union organizers to the parking lot. Handbilling automobiles moving from the parking lot from the median strips may have been ineffective or it may even have proved hazardous. Attempts to identify Hutzler employees in the store might have proved futile. Attempts to identify them on the streets, in restaurants, and in other public places might have been ineffective. There is not sufficient evidence in the record, however, on which to properly base those conclusions. There is not, therefore, substantial evidence to sustain the Board's finding. The Board's order is reversed and its cross-petition for enforcement is denied.
 
 
 38
 REVERSED AND ENFORCEMENT DENIED.