Robert KALFUS, Plaintiff,

v.

The NEW YORK AND PRESBYTERI-
AN HOSPITAL; Special Patrolman
Sergeant Steven Rodriguez; Special
Patrolman Arnold Palmer; Special
Patrolmen John Does # 1–4; the City
of New York; Lieutenant Eugene
Whyte; New York City Police Officers
John Does # 5–8, Defendants.

No. 07 Civ. 11455(DAB).

United States District Court,
S.D. New York.

March 31, 2010.

Ilann M. Maazel, Ogilvie Andrew Fraser Wilson, Emery Celli Brinckerhoff & Abady, LLP, New York, NY, for Plaintiff.

Kenneth John Kelly, Epstein, Becker & Green, P.C., James Michael Treece, Epstein Becker & Green, P.C., Afsaan Saleem, New York City Law Department, New York, NY, for Defendants.

### MEMORANDUM & ORDER

DEBORAH A. BATTS, District Judge.

Before the Court are two motions brought by Defendants New York Presbyterian Hospital ("NYPH" or "the Hospital") and the City of New York (the "City"), seeking summary judgment on Plaintiff's claims relating to his arrest by NYPH Special Patrolmen on May 14, 2007. Plaintiff's Complaint pursues multiple claims under 42 U.S.C. § 1983, as well as state claims for assault and battery, false arrest, malicious prosecution, negligence, and negligent hiring, training and retention. Plaintiff has since withdrawn his fourth cause of action for negligence. (Pl.'s Opp. to NYPH at 11 n. 5.)

For the following reasons, the City Defendants' Motion for Summary Judgment is GRANTED in its entirety and the Hospital Defendants' Motion for Summary Judgment is GRANTED, in part, and DENIED, in part.

### I. BACKGROUND

A. Events Leading Up to the Confrontation

Plaintiff Robert Kalfus ("Kalfus" or "Plaintiff") is a fifty-five year old freelance photojournalist for *The New York Post* who has been employed as a professional news photographer for more than thirty-three years. (Kalfus Dep. at 16–19.) The NYPH Defendants include the New York and Presbyterian Hospital itself, which is a private hospital licensed by the State of New York pursuant to Article 28 of the New York Public Health Law, Sergeant Steven Rodriguez, Officer Arnold Palmer, Officer Nelson Junco and Officer Jarrett Omoneukanrin (together the "Special Patrolmen"). (Compl., ¶¶ 7–10; Pit's 56.1 Stmt. (N.Y.PH) ff 7–10.) The Special Patrolmen are hired by NYPH to "protect life and property, prevent and detect crimes, arrest offenders, enforce all laws and ordinances and such service to patients, visitors, and employees as is consistent with good security practice." (Liberman Aff. Ex. 5 at 7.) The Special Patrolmen's authority is delegated to them by NYC Administrative Code § 14–106, which permits the Police Commissioner to swear in Special Patrolmen requested by any person or corporation who shows necessity for their services. NYC Administrative Code § 14–106(c). Special Patrolmen, "shall possess the powers, perform the duties, and be

subject to the orders, rules and regulations of the department in the same manner as regular members of the force." NYC Administrative Code § 14–106(b). City Defendants include the City of New York and Lieutenant Eugene Whyte, who is the Media Liaison of the New York Police Department Office of the Deputy Commissioner of Public Information. (Whyte Dep. at 10–12.)

On May 14, 2007, Plaintiff was assigned to take a photograph of then New York Yankees Manager Joe Torre. (Pit's 56.1 Stmt. (N.Y.PH) ¶ 15–16.) Members of the media were apparently aware of the fact that Joe Torre's brother, Frank Torre, was recovering after a kidney transplant at NYPH, and therefore concluded that waiting at the hospital would present an opportunity to take photographs of Joe Torre when he visited his brother. (Kalfus Dep. at 69.) Plaintiff asserts that NYPH's own website announced the recovery of their celebrity patient. (Pit's Opp. to NYPH at 2; Wilson Decl. Ex. W.) [1]

At around 11:00 AM, on May 14, 2007, Plaintiff arrived at NYPH and was informed by a fellow member of the press that the press had been assembling near the entrance to NYPH's Milstein Building, on Fort Washington Avenue. (Kalfus Dep. at 70–71.) By noon. Plaintiff and other journalists "including Sam Costanza from the *Daily News*," had been "waiting on or next to the steps across from the Milstein Building." (Pit's Opp. to NYPH at 2; Kuder Decl. Ex. 1–6.) While Kalfus sat on the concrete slab next to the steps leading up to the Milstein building, a NYPH Security Guard and Special Patrolman, Officer Arnold Palmer, approached him at around 4:30 PM that afternoon. (Pit's Opp. to NYPH at 5.)

At the time Officer Palmer approached Plaintiff, Sergeant Steven Rodriguez, Officer Nelson Junco and Officer Jarrett Omoneukanrin, had just begun their shift at NYPH. At the beginning of every shift Sergeant Rodriguez conducts roll call. During the May 14, 2007 roll call. Sergeant Rodriguez informed his officers that Frank Torre was a patient and instructed them to tighten security up, especially with regard to the media, in light of the fact that a member of the press had already circumvented security and had gotten inside the hospital without being detected. (Rodriguez Dep. at 48–50.) The parties agree that the patrol route assigned to Officer Palmer that day included the Milstein lobby, driveway and outside steps. (Pit's 56.1 Stmt. (N.Y.PH) ¶ 58).

NYPH Defendants direct the Court to the NYPH Security Department Policy and Procedure Manual ("Security Manual") as the instrument advising the patrolmen how to carry out their duties. (*See* Liberman Aff. Ex. 5 at 94.) According to the Security Manual, the purposes of the policies set forth therein are to "maintain a safe and secure environment for patients, employees, visitors and assets." (Liberman Aff. Ex. 5 at 94.) The Security Manual also instructs that roll call be used to "[p]ost assignment[s] for officer and supervisors ... [and][a]lert staff of current situations in security." (Liberman Aff. Ex. 5 at 98.)

In addition to looking to the Security Manual and the roll call instructions for how the Special Patrolmen should act, officers also look to custom and practice. Multiple officers and NYPH employees agree that an informal policy for dealing with the press exists at NYPH. The policy is to prohibit the press on NYPH premises without authorization from the Public Af-

---

1. The Court is not able to determine whether this is actually NYPH's website because the hyperlink is not legible on the submitted exhibit. (*See* Wilson Decl. Ex. W.)

fairs Department. (Dotson Aff. ¶¶ 6,10; Rodriguez Dep. at 39–40, 49–50, 56, 57, 111–12; Palmer Dep. at 71; Ramos Dep. at 20; Junco Dep. at 50–53, 74, 146, 151–52; McCarthy Dep. at 19–20, 48, 54–57; Omoneukanrin Dep. at 31, 81.)

Plaintiff, by his own admission, made no attempt to contact the NYPH Public Affairs Department on May 14, 2007, despite knowing that the Department existed, and despite knowing that Mr. Dotson was Director of Media Relations in the Department of Public Affairs at NYPH. (Kalfus Dep. at 114–17.) NYPH Special Patrolmen have, in the past, removed unauthorized press members from the premises, as well as other unauthorized individuals, including skateboarders, homeless persons, panhandlers, intoxicated individuals and anyone who previously had been banned from its premises. (Rodriguez Dep. at 33–34; Palmer Dep. at 96; McCarthy Dep. at 39–42.)

### B. Events on the Hospital Steps

By about 4:30 PM, on May 14, 2007, Officer Palmer, responding to a report that there had been members of the press loitering around the Milstein steps, went to investigate. (Palmer Dep. at 106, 111–12.) Officer Palmer initially approached Sam Costanza, a photographer for the *NY Daily News,* who was standing on the steps. (Palmer Dep. at 115.)

During their conversation. Officer Palmer directed Costanza to vacate the premises. (Palmer Dep. at 120.) After Officer Palmer's demand, Costanza vacated the steps and subsequently asked, "What about my partner?" (Palmer Dep. at 120.) Mr. Costanza pointed out Mr. Kalfus, who was still sitting on the concrete slab at the top of the stairs; at which point Palmer turned his attention to Mr. Kalfus. (Palmer Dep. at 120–121.)

Palmer informed Plaintiff that he was unauthorized to be on hospital property and needed to move to the public sidewalk. (Palmer Dep. at 121–22.) Officer Palmer also told Kalfus that his only alternative to leaving would be to get clearance for whatever business he was at the hospital to conduct. (Palmer Dep. at 121.) Kalfus testifies, however, that Palmer "didn't speak to the people to the left of [him] . . . didn't speak to anyone standing near [him] . . . [and instead] came over to [him]." (Kalfus Dep. at 99.)

At that moment, Kalfus turned on the audio recorder that was tied around his neck. (Kalfus Dep. at 89.) Kalfus objected to Palmer's request to move from the steps, asserting that his right to remain on the steps was the same as any other member of the public. (Pit's 56.1 Stmt. (N.Y.PH) ¶ 65; Audio at 00:20–00:30.) After Plaintiff declined his request. Palmer made a call on his portable radio to his supervisor, asking for backup. (Pit's 56.1 Stmt. (N.Y.PH) ¶ 67; Kalfus Dep. at 90.) Several officers responded to the alert, including Sergeant Rodriguez, Officer McCarthy, Officer Omoneukanrin, Officer Rodriguez and Officer Junco. (Pit's 56.1 Stmt. (N.Y.PH) ¶ 68.)

At this point Sergeant Rodriguez took over the conversation with Kalfus, (Kalfus Dep. at 109; Audio at 1:45), which was recorded as follows:

Rodriguez: What's your name?

Kalfus: Hi.

Rodriguez: What's your name?

Kalfus: I'm talking to Mr. Steve Rodriguez here.

Rodriguez: Sgt. Steve Rodriguez

Kalfus: Sgt. Steve Rodriguez. Thank you.

Rodriguez: I asked you for your name three times.

Kalfus: You did, but that isn't your property.

Hands off. You touch me, I'll have you locked up, you got it?

Rodriguez: Will you really?

Kalfus: Yeah, I will. Yeah, I will.

Rodriguez: This is our property right here.

Kalfus: Yeah.

Rodriguez: We're eight feet from the curb is your property. It's public property. You're on our property now. If you have no business in the hospital, you're not visiting a patient, and you're not a visitor, and you're not a patient, you have to exit the institution. You're presently . . .

Kalfus: I'm not in the institution

Rodriguez: . . . on our property. My officers, my officers asked you,

Kalfus: and you keep talking . . .

Rodriguez: My officers asked you several times to vacate the premises . . .

Kalfus: No, they didn't ask me.

Rodriguez: . . . and you're refusing. You're on private property now. Please vacate the institution.

Kalfus: Along with every other person smoking here and polluting the air.

Rodriguez: What are you hear for?

Kalfus: I'm here, waiting for the hospital spokesperson to tell us, if and when, Joe Torre will meet us. That's what I'm here for.

Rodriguez: You can wait off the property, and I'll make sure that Mr. Dotson, whose in charge of Public Affairs will contact you. Is that fair enough? So that there isn't any conflict between Security or anybody else.

Kalfus: It's not a matter of fair. I'm not going to willingly have you violate my rights to be . . .

Rodriguez: No, we're not talking about rights, we're talking about you being on property.

Kalfus: You know, why do you? You just keep talking. You.. yourself.

You ask me a question, I'm answering you.

Rodriguez: I'm not . . . anything.

Kalfus: You are.

Rodriguez: I'm asking you nicely, to please vacate the property so that we can . . .

Kalfus: Thank you for asking.

Rodriguez: . . . get the proper authorities to speak to you . . .

Kalfus: Thank you for asking.

Rodriguez: O.K.?

Kalfus: Thank you for asking.

Rodriguez: Can you please?

Kalfus: Thank you for asking.

Rodriguez: I'm sorry?

Kalfus: Thank you for asking.

Rodriguez: Absolutely, I'm here to help you . . .

Kalfus: Rolling, rolling.

Rodriguez: Continue to roll.

Kalfus: We're rolling.

Rodriguez: Sir?

Kalfus: Thank you for asking.

Rodriguez: Are you ready to leave?

: No, I'm not. Thank you.

Rodriguez: Help me out.

Kalfus: According to the Court of Appeals . . .

Rodriguez: I'm not here for the Court of Appeals,

Kalfus: Yeah

Rodriguez: I'm telling you this is private property and

Kalfus: Yeah

Rodriguez: I'm going to issue you a summons for trespass, and I'm going to lock you up. Now, I'm asking you nicely to vacate or that's the process that's going to happen to you. You're refusing to give me your name.

Kalfus: No, I didn't. You're, you're, you're . . .

Rodriguez: No, I asked you, I asked you three times for your name

Kalfus: You, you're too busy talking, I want to answer, you keep talking right through me.

Rodriguez: I asked you your name three times, and you didn't give it to me.

Kalfus: No, you didn't ask me three times.

Rodriguez: Are you going to leave the property?

Kalfus: That's why the tape's rolling.

Rodriguez: Are you going to leave the property?

Kalfus: You're making up things that didn't happen.

Rodriguez: Sir, I'm going to ask you one more time, if you don't leave I'm going to arrest you.

Kalfus: [Silence]

Rodriguez: Sir, please stand up and put your hands behind your back.

Kalfus: No[ ][2]

(Audio at 1:43–4:10; Pit's 56.1 Stmt. (N.Y.PH) ¶ 84.)

During the time that Sergeant Rodriguez was speaking with Plaintiff there were a few people standing on the steps, but most were using them to enter or exit the Hospital. (Video 70856(a) at 00:00–03:59; Video 70856 at 02:21–04:00.) Although a number of people later gathered and stood on the steps, this appears to have been in response to the confrontation that was occurring. (Video 70856 at 04:00–05:10.) It also appears from the video that partway through the preceding conversation. Sergeant Rodriguez inspected the credentials hanging from Kalfus' neck. (Video 70856 at 02:40–02:45.)

After refusing to obey Sgt. Rodriguez' order, the officers forcibly placed Kalfus face down on the ledge and arrested him by cuffing his hands behind his back. (Kalfus Dep. at 124.) During the arrest. Plaintiff was lifted up and placed back down to facilitate better maneuverability for the officers. (Kalfus Dep. at 124.) Kalfus asserts that he then felt severe pain in his right hand and right shoulder, as well as his chin after it smacked into the ledge during the arrest. (Kalfus Dep. at 124.) While pinned down by Sergeant Rodriguez, Officer Palmer and Officer Omoneukanrin, Plaintiff's cuffed hands were lifted, causing pain and pressure on Plaintiff's shoulders, and in particular his right shoulder. (Kalfus Dep. at 124–25.) Kalfus states that "[i]t was the worst pain I've ever felt ... I was screaming, begging him to stop." (Kalfus Dep. at 124.) Plaintiff asserts that prior to the May 14, 2007 incident, he had a minor rotator cuff tear amounting to only five millimeters; however, after the arrest the tear had quadrupled to two centimeters. (Levy Dep. at 11; Levy Dep. at 32; Wilson Dec. Ex. Z.)

The Special Patrolmen, however, claim that they used only the level of force necessary to arrest Plaintiff. They assert that they executed a typical arrest and followed procedure in putting the arrestee in a prone position and handcuffing the arrestee behind his back so that the arresting officers are protected from any potential assault from the arrestee. (Rodriguez Dep. at 23–24; Palmer Dep. at 45, 140; Omoneukanrin Dep. at 77; Junco Dep. at 23–24.) In addition. Defendants argue that Plaintiff's own orthopedic surgeon believes the "second tear" of Plaintiff's rotator cuff, on May 14, 2007, was a result of his previous injury. (Levy Dep. at 31–32.)

---

**2.** NYPH's 56.1 Statement placed an exclamation point after Plaintiff's "no", but Plaintiff has objected to the punctuation of "no" which, he contends, is spoken in a neutral voice. (Pit's 56.1 Stmt. (N.Y.PH) ¶ 84.)

Plaintiff was eventually brought to his feet by Sergeant Rodriguez, Officer Palmer and Officer Omoneukanrin, and escorted by Officers Palmer and Omoneukanrin to NYPH's Security Command Center ("SCC"). (Pit's 56.1 Stmt. (N.Y.PH) ¶ 96.) Kalfus claims that the officers "yanked [him] up by his handcuffs with such force that they tore his right shoulder rotator cuff and caused him excruciating pain." (Compl. ¶ 35.)

While the Special Patrolmen were affecting Plaintiff's arrest, Sam Costanza was also arrested by Officer Junco and Sergeant Rodriguez for pushing Sergeant Rodriguez while on the sidewalk. (Junco Dep. at 89–91.)

The parties have differing perspectives regarding what occurred during the escort of Plaintiff to the SCC. The video, from a variety of security cameras, depicts the Officers behind Kalfus leading him to the SCC. (Video 70856b 00:00–00:05; Video 70856c 00:20–00:30; Video 70856d 00:00–00:20; Video 70856e 00:00–00:22; Video 70856f 00:00–00:06; Video 70856g 00:00–00:06.) The Officers contend that Plaintiff was insubordinate, and that by struggling and resisting. Plaintiff made the walk unnecessarily difficult. (Defs' 56.1 Stmt. (N.Y.PH) ¶ 99.) Plaintiff, on the other hand, asserts that he never resisted; and on the contrary, that he feared for his safety because he did not know where he was being led and because the officers were pulling him in different directions. (Pit's 56.1 Stmt. (N.Y.PH) ¶ 96.) The audio contains what might be characterized as "shrieks" and "screams" from Kalfus while being escorted to the SCC. (Audio at 05:50–06:30.)

While en route to the SCC, the Special Patrolmen escorted Kalfus through the lobby of the Harkness Pavilion, and took an approximately 10 second elevator ride from the ground floor to the first floor. (Pit's 56.1 Stmt. (N.Y.PH) ¶ 101.) Kalfus

claims that he was violently thrown into the elevator cab and that while the cab was ascending, one of the officers placed his hand by Plaintiff's lower back, under his underwear and "shov[ed] his fingers towards Mr. Kalfus' anus." (Compl. ¶ 37; Pit's 56.1 Stmt. (N.Y.PH) ¶ 102–03; Kalfus Dep. at 140–42.) Audio reveals that Kalfus repeatedly stated "Get your hands out of my pants" and "[c]all the police." (Audio at 06:23–06:35.) Both officers deny these allegations of improper sexual contact. (N.Y.PH's Mem. Law at 5; Palmer Dep. at 19–20; Omoneukanrin Dep. at 105.) The Officers contend that Kalfus was intentionally dropping to the floor of the elevator and that Officer Palmer was merely grabbing Kalfus' belt in an attempt to keep Kalfus standing. (Palmer Dep. at 163–65; Omoneukanrin Dep. at 98–100.)

Upon reaching the SCC, Kalfus was seated in a chair for about two hours while waiting for a car to escort him to the 33rd Precinct police station. (Pit's 56.1 Stmt. (N.Y.PH) ¶ 106.) During that time. Officer Palmer was treated in the emergency room for an injury to his knee, sustained during Plaintiff's arrest. (Pit's 56.1 Stmt. (N.Y.PH) ¶ 107.) The injury consisted of a scrape that was bleeding, but the record is unclear as to exactly how the wound occurred, or how bad the wound was bleeding. Officer Palmer did not need any stitches to close the wound. (Palmer Dep. at 140–41.) Kalfus and the escorting Officers, Palmer and McCarthy, arrived at the 33rd Precinct at 7:10 PM, roughly two and a half hours after Kalfus was arrested. (Palmer Dep. at ¶ 121.)

C.   Events at the Police Station

At the precinct, Kalfus was placed in a holding cell to await further instructions. (Kalfus Dep. at 191.) Because Plaintiff was a member of the press. Lieutenant Whyte, the Media Liaison of the New York

Police Department Office of the Deputy Commissioner, was called to help process the arrest. (Pit's Opp. to City at 2, 3; Whyte Dep. at 10–12.) Lieutenant Whyte reviewed the photographs that had been taken on Kalfus' and Costanza's cameras, and had further discussions regarding the circumstances surrounding their arrest with Sergeant Rodriguez and the other officers who were present. (Whyte Dep. at 84, 96–97; Rodriguez Dep. at 93, 96.) After further deliberations. Lieutenant Whyte released Costanza, believing that he had not trespassed at the time of his arrest because he was on the public sidewalk. Kalfus, however, was processed and ultimately charged with resisting arrest and trespass. (Whyte Dep. at 112; Wilson Dec., Ex. X.)

Plaintiff contends that the reason Lieutenant Whyte prosecuted him was because of a vendetta against him from six months earlier. (Pit's Opp. to City at 4.) In October 2006, Plaintiff had a run-in with Lieutenant Whyte while he was dispatched to photograph a murder scene in the Bronx. (Pit's Opp. to City at 2; Kalfus Dep. at 283–84.) Officers at the incident believed that Kalfus was in a publicly prohibited area and requested that he leave. (Kalfus Dep. at 288.) Kalfus was then confronted by Lieutenant Whyte, who confiscated Kalfus' press pass for more than two hours. (Kalfus Dep. at 287–88.) Kalfus believes that after "standing up to Whyte to preserve the ability of the press to take photos from public areas," Lieutenant Whyte had been out to get him, which is why, Kalfus states, he had tried to avoid Lieutenant Whyte at the precinct on May 14, 2007. (Pit's Opp. to City at 4; Kalfus Dep. at 292–93.) Plaintiff contends that on May 14, 2007, Lieutenant Whyte said "I'll bet I'm the last person you would ever want to see," and that this comment illustrates Lieutenant Whyte's disdain for Kalfus. (Kalfus Dep. at 263–64.)

Lieutenant Whyte then issued Plaintiff a Desk Appearance Ticket, which is an order to appear in criminal court, and confiscated Plaintiff's press card. (Whyte Dep. at 109–12.) The parties disagree about who had authority to, and who in fact did, make these decisions. Lieutenant Whyte claims that he was following orders from his superior. Chief Collins. (Whyte Dep. at 41.) Plaintiff, however, notes that Chief Collins has no recollection of such a conversation. (Pit's Opp. to City at 5; Whyte Dep. at 41; Collins Dep. at 64–65.)

Although it is protocol for a member of the press to be relieved of their press card upon arrest. Defendants concede that at times this policy has not been followed. (Collins Dep. at 32.) However Plaintiff admits that the press card is "[p]roperty of the NYPD" and can be "taken away by competent authority at any time." (Pit's 56.1 Stmt. (City) ¶¶ 29, 32; Kalfus Dep. at 295; Saleem Dec. Ex. I.) Plaintiff claims that it took over a month from May 14, 2007 to retrieve his press pass and that Lieutenant Whyte intentionally delayed its return to him. (Pit's Opp. to City at 5–6; Kalfus Dep. at 277.) Plaintiff received his press card back from the precinct "approximately seven weeks after the May 14th arrest," and in the meantime Plaintiff used a temporary pass at work. (Kalfus Dep. at 279–80.)

On May 22, 2007, Sergeant Rodriguez signed a complaint filed with the Criminal Court of the State of New York and the Assistant District Attorney brought charges of trespass and resisting arrest, pursuant to PL 140.05 and PL 205.30 respectively, against Plaintiff. Plaintiff was represented by an attorney that *The New York Post* provided for him. (Pit's 56.1 Stmt. (N.Y.PH) ¶¶ 140, 142.) Plaintiff's attorney in the criminal matter moved to dismiss the claims of trespass and resisting arrest, and on August 14, 2007, the

prosecution voluntarily dismissed the case because it determined that "[t]he People cannot prove the case beyond a reasonable doubt." (Wilson Dec. Ex. Y; Pit's 56.1 Stmt. (N.Y.PH) ¶ 142; Compl. ¶ 53.)

## II.  DISCUSSION

### A.  Standard for Summary Judgment

A district court should grant summary judgment when there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *James v. New York Racing Ass'n*, 233 F.3d 149, 152 (2d Cir.2000). While a court must always "resolve ambiguities and draw reasonable inferences against the moving party," *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir.2002), "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir.2007). Instead, when the moving party has documented particular facts in the record, "the opposing party must 'set forth specific facts showing that there is a genuine issue for trial.'" *Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 224 (2d Cir. 2006) (quoting Fed.R.Civ.P. 56(e)). Establishing such facts requires going beyond the allegations of the pleadings, as the moment has arrived "'to put up or shut up.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (citation omitted). Unsupported allegations in the pleadings thus cannot create a material issue of fact. *Id.*

### B.  First Amendment Retaliation Claim Against the City Defendants

■ In order to state a First Amendment retaliation claim, a private citizen must show "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir.2010) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir.2001)).

■ Plaintiff alleges that his First Amendment rights were abridged when City Defendants took his press card in retaliation for exercising those rights as a photographer and member of the press. (Compl. ¶¶ 45–47, 69.) The City Defendants respond that Plaintiff cannot establish any of the elements of a First Amendment Retaliation claim. (City Defs' Mem. Of Law, at 6–9.) In the absence of citation to any authority for the proposition that Plaintiff has a First Amendment interest in the press pass, the Court agrees with Defendants, especially given that the press pass states that it is the NYPD's property and that Plaintiff agreed that the pass could be taken away at any time by competent authority.[3] (Pit's 56.1 Stmt. (City) ¶¶ 27–33.)

Further, in his memoranda of law opposing summary judgment. Plaintiff appears to have abandoned his First Amendment retaliation claim and instead urges the Court to find that "[t]he City's complete lack of any coherent policy for revoking press credentials violates the First Amendment." (Pit's Opp. to City at 10.)

---

3.  While Plaintiff argues that a press pass is necessary in order for a member of the press to perform his job, and that he was hindered in obtaining access to "government buildings, courts, and ordinary citizens who refused to have their picture taken by someone without credentials," (Pit's Opp. to City, at 8–9), Plaintiff nowhere alleges claims based upon such incidents.

However, not only does Plaintiff fail to cite to any authority within the Second Circuit that would support a Section 1983 claim based upon a municipality's press pass policy, it is apparent from the Complaint that Plaintiff has nowhere pled the elements of a *Monell* claim based upon an allegedly unconstitutional custom or practice.

Accordingly, City Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's First Amendment claim.

### C. False Arrest Claim Against NYPH Defendants

To succeed on a claim for false arrest under Section 1983 and New York Law, Plaintiff must show that: "(*1*) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir.2003) (internal citations omitted). "An arrest made on probable cause is privileged, and probable cause exists when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Shain v. Ellison*, 273 F.3d 56, 68–69 (2d Cir.2001) (internal citations omitted).

Here, the parties agree that the disputed issue is whether NYPH Defendants had probable cause to arrest Plaintiff for trespass under Section 140.05 of the New York Penal Law (the "Trespass Law"), which provides that "a person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises." As further defined by Section 140.00(5), "[a] person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a

*lawful order* not to enter or remain, personally communicated to him by the owner of such premises or other authorized person." (emphasis added).

Plaintiff contends that Special Patrolman Rodriguez did not have probable cause because the repeated orders given to him to leave the property of the Hospital were not 'lawful' under the Trespass Law, and thus he had a "license and privilege" to remain on the hospital steps as long as it was open to the public. (Pit's Opp. to NYPH Defs, at 11–12.) Plaintiff argues that Rodriguez' order was not 'lawful' because "[t]he special patrolmen targeted [him] for one and only one reason: he was a photographer for the *New York Post*." (Pit's Opp. to NYPH Defs, at 12.) Thus, Plaintiff contends. Patrolman Rodriguez' order was not lawful because it was based upon an abridgment of his First Amendment rights.

Defendants assert, however, that even assuming the NYPH ordered Plaintiff off of the Hospital's steps because he was a reporter, the Hospital is not a state actor and therefore Plaintiff's First Amendment Rights were never implicated. (N.Y.PH Defs' Mem. of Law, 3–4 & n. 4.) In response. Plaintiff cites to two cases for the proposition that "Special Patrolmen acting pursuant to statutory grant of police power are sufficiently controlled by the state to be properly characterized as acting 'under color of state law.'" (Pit's Opp. to NYPH, at 17 n. 10.)

However, neither of the cases cited by Plaintiff, *Temple v. Albert*, 719 F.Supp. 265 (S.D.N.Y.1989), or *Rojas v. Alexander's Dept. Store, Inc.*, 654 F.Supp. 856 (E.D.N.Y.1986), involved a Special Patrolman carrying out the instructions or policies of a private employer, such as directing trespassers to leave their employers' private property. Rather, both cases involved Special Patrolmen using the powers

and authority invested in them by state law, to arrest and detain individuals. Indeed, the Second Circuit has found that "[a]lthough no bright line separates actions taken 'under color of law,' " and thus encompassed by Section 1983, "from personal pursuits, the relevant question in determining whether an action was taken under color of law is not whether the action was part of the defendant's official duties but, rather, whether the action was made possible only because the wrongdoer is clothed with the authority of [ ] law." *U.S. v. Temple*, 447 F.3d 130, 138 (2d Cir.2006) (citing *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, (1945)) (additional quotations and citations omitted.)

■ Here, the Court distinguishes between Officer Palmer and Sergeant Rodriguez' repeated requests that Plaintiff leave the Hospital's property, under Section 140.00(5) of the New York Trespass Law, and their subsequent arrest of Plaintiff, which was only possible because of the police powers granted to them. Accordingly, even assuming that the NYPH and its agents ordered Plaintiff to leave the premises because he was a member of the press, the Court finds that there was no state action on which Plaintiff may claim an abridgment of his First Amendment Rights, and thus no basis on which to find that their order was unlawful under the Trespass Law.

This conclusion is further supported by the Supreme Court's seminal First Amendment "state action" case of *Lloyd Corp., Limited v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), in which the Court held that the owner of a private shopping center containing numerous public facilities could nonetheless proscribe the distribution of handbills within the center because "the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on

state action, not on action by the owner of private property." *Id.*, 568, 92 S.Ct. 2219. The Supreme Court expressly noted that the security guards who directed respondents to leave the center and threatened to arrest them if they did not "are commissioned ... by the city of Portland ... have police authority within the Center, wear uniforms similar to those worn by city police, and are licensed to carry handguns." *Id.*, 554, 92 S.Ct. 2219. Nevertheless, despite the powers invested in them by the city, the Court found no state action where the guards were acting on behalf of their private employer and without use of their police powers.

Plaintiff also cites to *People v. Leonard*, 62 N.Y.2d 404, 408, 477 N.Y.S.2d 111, 465 N.E.2d 831 (N.Y.1984), for the proposition that where "the property is open to the public at the time of the alleged trespass ... the accused is presumed to have a license and privilege to be present." However, *Leonard* involved a prosecution for trespass on SUNY Binghamton's *public* campus, and turned on the prosecutions's failure to show, beyond a reasonable doubt, that the University President's order that the Defendant leave campus was "lawful" under the Trespass Law, because the prosecution did not demonstrate that the order was based on something other than " 'the race, creed, color, national origin, sex, or disability, or marital status' of the person sought to be excluded." *Id.*, 410, 477 N.Y.S.2d 111, 465 N.E.2d 831.

While the New York Court of Appeals also noted the possibility of a First Amendment issue with the President's order, it supported this possibility by citing to two Supreme Court cases which have been overturned or severely limited in their applicability. The first of these cases. *Amalgamated Food Employees Union Local 590 v. Logan Plaza*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968),

was explicitly distinguished by *Lloyd Corp., Limited v. Tanner, supra,* and later abrogated by *Hudgens v. N.L.R.B.,* 424 U.S. 507, 518, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) (finding that "the rationale of *Logan Valley* did not survive the Court's decision in the *Lloyd* case.") The second case cited by *Leonard, Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), found the First Amendment applicable to a "so-called company town," but has been expressly limited to cases where "private property ... has taken on all the attributes of a town, *i.e.,* residential buildings, streets, a system of sewers, a sewer disposal plant and a 'business block' on which business places are situated." *Hudgens,* 424 U.S. at 516, 96 S.Ct. 1029.

■ Because there is no hint of a civil rights violation on the record, and because the Hospital is not public property or the equivalent of a company town, the Court finds the facts and holding of *Lloyd Corp.,* rather than *Leonard,* to be controlling here. *See also, Downs v. Town of Guilderland,* 70 A.D.3d 1228, 897 N.Y.S.2d 264 (3d Dep't 2010) (distinguishing *Leonard* and finding no false arrest where, because there was no state action on which to base a free speech defense, police officer had probable cause to arrest individuals wearing protest t-shirts for refusing to leave private shopping mall as directed).

Therefore, because the Court finds that Plaintiff was given a "lawful order" by the NYPH to vacate the premises and did not do so, the Special Patrolmen had probable cause to affect his arrest under New York's Trespass Law. Accordingly, NYPH Defendants' summary judgment motion on Plaintiff's false arrest claims is GRANTED.

### D. Malicious Prosecution Claims Against City Defendants

■ To succeed on a claim for malicious prosecution under Section 1983 and New York Law, Plaintiff must show that "(1) a prosecution was initiated against him, (2) that it was brought with malice (3) but without probable cause to believe that it could succeed and (4) that the prosecution terminated in favor of the accused plaintiff." *Boyd v. City of New York,* 336 F.3d 72, 76 (2d Cir.2003) (internal citations omitted). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Id.* (internal citations omitted).

■ The Court found in Section II.C., *supra,* that the Special Patrolmen had probable cause to arrest Plaintiff for trespassing. Therefore, in order to satisfy the third element of a malicious prosecution claim there must be "some indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest." *Johnson v. City of New York,* 2008 WL 4450270, *9 (S.D.N.Y. Sept. 29, 2008) (quoting *McDermott v. City of New York,* 1995 WL 347041, *5 (E.D.N.Y. May 30, 1995); citing *Feinberg v. Saks & Co.,* 56 N.Y.2d 206, 451 N.Y.S.2d 677, 436 N.E.2d 1279 (N.Y.1982)).

■ Because Plaintiff has not pointed to any evidence demonstrating that the Defendants became aware of exculpatory evidence after Plaintiff's arrest but prior to his prosecution. City Defendants summary judgment motion is GRANTED with respect to Plaintiff's Malicious Prosecution claims.

### E. Excessive Force Claims Against NYPH Defendants

■ "When determining whether police officers have employed excessive force in the arrest context the Supreme Court has instructed that courts should

examine whether the use of force is objectively unreasonable in light of the facts and circumstances confronting them, without regard to the officers' underling intent or motivations." *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "The touchstone of the inquiry, then, is reasonableness, and measuring it, [the Court] consider[s] the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Id.* (internal citation omitted). The Court is "mindful that the reasonableness inquiry does not allow [it] to substitute [its] own viewpoint" and that it "must judge the officer's actions from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865).

Here, Plaintiff argues that the NYPH Defendants used excessive force (1) by turning Plaintiff, twisting his arms behind his back, pushing him face first onto the concrete slab, cuffing him, pinning his knee, and yanking his cuffed arms up with enough force to tear his right rotator cuff, (Pit's Opp. to NYPH, at 6); (2) by pushing him down the steps onto a bustling public street, (Pit's Opp. to NYPH at 6); (3) by throwing Plaintiff face first into the elevator. (Pit's Opp. to NYPH at 7); and (4) by placing a hand inside his underwear and reaching toward his anus during the elevator ride, (Pit's Opp. to NYPH at 7.)

■ The NYPH Defendants argue that the evidence before the Court, including audio and visual evidence, as well as the applicable law are sufficient for the Court to grant summary judgment on Plaintiff's excessive force claims. Indeed, "[i]ncontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on [a motion for summary judgment] if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner v. Summerlin,* 494 F.3d 344, 371 (2d Cir.2007).

■ The audiotape demonstrates that when Special Patrolman Rodriguez asked Plaintiff to stand and place his hands behind his back, he refused to do so and stated "no." It was at this point that the Special Patrolmen used force to arrest Plaintiff. In considering the factors considered under the Supreme Court's decision in *Graham,* it is apparent that Plaintiff's crime of trespass was not severe. In addition, although he was clearly confrontational, it does not appear that he posed a physical threat to the officers or the public. However, it is equally apparent that Plaintiff was attempting to resist arrest by refusing to stand and place his arms behind his back. Had he done so, he would have avoided the use of force altogether.

The video of the incident shows that Sergeant Rodriguez grabbed Plaintiff's right arm and began to turn him counterclockwise so that his chest would face the concrete slab. As he did so, another Special Patrolman approached from Plaintiff's left and also reached for Plaintiff. As Sergeant Rodriguez continued to turn Plaintiff, Plaintiff clearly pushed back with his weight to avoid being turned. However, Sergeant Rodriguez continued to pull Plaintiff's arm or arms to the left and onto the concrete slab, thus nearly flipping the Plaintiff. At this point, an additional Special Patrolman approached from the right. This Special Patrolman and Sergeant Rodriguez then struggled to pull Plaintiff's arms behind his back and handcuff him. Starting at this point in the video, much of Plaintiff's body is obscured by the leaves

of a plant, although Plaintiff's left arm can be seen outstretched on the concrete slab as he clearly resists being handcuffed by the Patrolmen. Within a few seconds the Plaintiff's hands were pulled behind his back by Sergeant Rodriguez. After an additional few seconds of securing the handcuffs and assuring that Plaintiff was immobile, the Patrolmen brought Plaintiff to his feet. (Video 70856 at 03:05–03:40.) Contrary to Plaintiff's claims that he was pulled up by his handcuffs, the video clearly shows that Plaintiff was pulled to his feet by two Patrolmen, one of whom gripped his legs or waist, and the other of whom gripped his sweatshirt. (Video 70856 at 03:40–03:43.)

The Court finds that Plaintiff was clearly resisting arrest throughout the entire time that physical force was used. It also finds no evidence that the officers punched, kicked or struck Plaintiff in any way, and no evidence that Plaintiff was "yanked" up by his handcuffs or dropped while he was handcuffed. The Court also finds that it was necessary for the Special Patrolmen to have lifted Plaintiff's hands in order to handcuff him, and that applying pressure to the back of his knee was objectively reasonable in order to prevent him from kicking in an attempt to prevent the handcuffing. In sum, the Court finds that the Special Patrolmen used only objectively reasonable force under the circumstances, and that no reasonable juror could find that they engaged in the use of excessive force at the time of Plaintiff's arrest.

Further, the Court finds that the surveillance video clearly shows that Plaintiff was not pushed down the steps toward the street, and therefore that no claim for excessive force may lie based upon this allegation. (Video 70856a at 02:10–02:20.)

■ However, because there is no video and the audio is inconclusive, the Court does find a genuine issue of material fact regarding whether Officers Palmer and Omoneukanrin pushed Plaintiff into the elevator and whether Office Palmer grabbed beneath Plaintiff's underwear toward his anus, and if so, whether these actions constituted excessive force. Defendants' argument that Plaintiff received no permanent injury from these alleged actions is unavailing. *See Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir. 2004) ("[A] plaintiff need not sustain sever injury to maintain a claim that the use of force was objectionably unreasonable under the Fourth Amendment.")

Accordingly, the NYPH Defendants' Motion for Summary Judgment is GRANTED with respect to the force used during Plaintiff's arrest, but DENIED with respect to the alleged force used while entering and riding in the elevator to the SCC.

### F. Deliberate Medical Indifference

■ To succeed on a claim for inadequate medical treatment based upon deliberate indifference, a Plaintiff "must satisfy two requirements—one objective and one subjective—in order to prevail ... [1] that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious'—that is ... a condition of urgency, one that may produce death, degeneration, or extreme pain ... [and][2] that the charged official acted with a sufficiently culpable state of mind." *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotations omitted). The subjective culpability requirement is met if the "charged official knows and disregards an excessive risk to [Plaintiff's] health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

■ Although Plaintiff appears to have alleged a claim for deliberate medical indifference under Section 1983 in the Complaint, he did not respond to the NYPH Defendants' contention that the Court should grant them summary judgment on that claim. Further, Plaintiff concedes that while at the SCC, after asking for medical attention and being informed that the Patrolmen would contact the NYPH for assistance.. Plaintiff stated "I don't want it from this hospital." (Pit's 56.1 Stmt. (N.Y.PH) ¶ 116–17.) Plaintiff admits that he made no further requests for medical attention. (Pit's 56.1 Stmt. (N.Y.PH) ¶ 118.) Accordingly, in light of these facts, the Court finds that Plaintiff cannot make out the elements of a claim of medical indifference. The Court therefore GRANTS summary judgment to NYPH Defendants on Plaintiff's deliberate medical indifference claim.

G. Conspiracy

■ To prove a claim for conspiracy under Section 1983, a Plaintiff must show "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir.2002) (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999)).

■ Here, Plaintiff does not contest Defendants' argument that there is no evidence showing an agreement among the Defendants to inflict a constitutional injury upon him. Because the evidence supports Defendants' reading of the record, the Court GRANTS summary judgment on Plaintiff's Conspiracy claim.

H. Negligent Hiring, Training, Discipline, and Retention.

■ An employer may be held liable for negligent hiring, training, discipline and retention under New York law if it "knew or should have known of the employee's violent propensities." *Wahhab v. City of New York*, 386 F.Supp.2d 277, 293 (S.D.N.Y.2005). Because Plaintiff does not contest Defendants' arguments with respect to this claim, and because Plaintiff has not provided any evidence to indicate that any of the Defendants had a history of or propensity toward violence, or that the NYPH provided negligent training. Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's Negligent Hiring, Training, Discipline, and Retention claim.

### III. CONCLUSION

For the foregoing reasons, the City Defendants' Motion for Summary Judgment is GRANTED in its entirety. The Clerk of Court is directed to remove Defendants City of New York and Lieutenant Eugene Whyte from the Docket. The NYPH Defendants' Motion for Summary Judgment is GRANTED, in part, and DENIED, in part. All of Plaintiff's claims against the NYPH Defendants, with the exception of his excessive force claims arising from the alleged incidents while entering and riding in the elevator to the SCC, are DISMISSED, with prejudice.

Should Plaintiff determine to pursue his remaining claim of excessive force in the elevator against NYPH Defendants, being mindful of Rule 11 Sanctions, the parties are to adhere to the following pre-trial submission dates: Joint Pre–Trial Statement ("JPTS"), Requests to Charge, Proposed Voir Dire, and Memoranda of Law addressing those issues raised in the JPTS, are to be filed sixty (60) days from the date of this Memorandum and Order; and Responses to the Memoranda of Law are to be filed ninety days (90) from the date of this Memorandum and Order. All

submissions shall be in accordance with the Court's Individual Rules of Practice. SO ORDERED.